[No. 36029. En Banc. January 31, 1963.]

THE STATE OF WASHINGTON, *Appellant,* v. GEORGE BERTRAND, *Respondent.*\*

\*Reported in 378 P. (2d) 427.

*James J. Solan* and *L. Edward Brown,* for appellant.

*Stanley J. Krause* and *Gladys Phillips,* for respondent.

WEAVER, J.—August 4, 1960, George Bertrand (defendant and respondent) was charged in the Superior Court of Grays Harbor County with assaulting another

" . . . to-wit: Thomas Brannon, with a weapon or other instrument or thing likely to produce bodily harm, to-wit: a firearm commonly known as a rifle, by aiming said firearm toward and discharging it into a motor vehicle in which Thomas Brannon was present, such discharging resulting in injury to Thomas Brannon . . . "

under circumstances not amounting to assault in the first degree.

It is conceded that George Bertrand is an enrolled member of the Quinaielt[1] Indian Tribe in the state of Washington; and that the offense with which he is charged was committed within the boundaries of the Quinaielt Indian Reservation.

The charge against Mr. Bertrand corresponds to the charge of "assault with a dangerous weapon," within the purview of the Ten Major Crimes Act (18 U.S.C. (1952 ed.) § 1153), which *in the absence of statutes discussed later,* places exclusive jurisdiction thereof in the courts of the United States. *In re Roberts v. Schneckloth,* 55 Wn. (2d) 105, 346 P. (2d) 668 (1959).

In *In re Arquette v. Schneckloth,* 56 Wn. (2d) 178, 351 P. (2d) 921 (1960), we called attention to the fact that, in 1953, Congress enacted Public Law 280, 83rd Congress, 1st Session (67 Stat. 588). By it the federal government

---

[1] We have adopted this spelling of the name since it is used in the treaty between the tribe and the United States (12 Stat. 971), although some of the documents and instruments, quoted *infra,* use "Quinault."

consents to the assumption of jurisdiction over Indians by the states.

The pertinent section provides:

"Sec. 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: . . ."

Pursuant thereto, the Washington legislature adopted Laws of 1957, chapter 240, p. 941. RCW 37.12.020 provides in part:

"Whenever the governor of this state shall receive from *the tribal council or other governing body* of any Indian tribe, community, band, or group in this state a resolution expressing its desire that its people and lands be subject to the criminal and civil jurisdiction of the state of Washington to the extent authorized by federal law, he shall issue within sixty days a proclamation to the effect that such jurisdiction shall apply to all Indians and all Indian territory, reservation, country, and lands of the Indian body involved in accordance with the provisions of this chapter: *Provided* . . ." (The proviso is not applicable to the instant case.) (Italics ours.)

The Governor's proclamation becomes effective 60 days after promulgation. RCW 37.12.030. In *State v. Paul,* 53 Wn. (2d) 789, 337 P. (2d) 33 (1959) (appeal dismissed 361 U. S. 898, 4 L. Ed. (2d) 155, 80 S. Ct. 203 (1959)), this court held chapter 240, *supra,* constitutional.

Subsequent to April 22, 1958, the Governor of the state of Washington received a document entitled, "Resolution of the Quinault Indian *Tribal Council.*" (Italics ours.) It refers to Public Law 280, *supra,* and Laws of 1957, chapter 240, *supra. Inter alia,* it contains the following resolution:

"It Is Resolved that the Quinault Indian *Tribal Council* hereby requests and expresses its desire that the criminal and civil jurisdiction of the State of Washington be extended to include the people of the Quinault Indian Tribe and all persons being and residing upon the Quinault Indian Reservation, the same being located in Grays Harbor County

and Jefferson County, Washington, particularly described as follows:

[Land description omitted.]

"And the President of the *tribal council* is directed to transmit to the Governor of the State of Washington, on behalf of the *tribal council* and the Quinault Indian Tribe, a true copy of this resolution." (Italics ours.)

The document bears a certification that the resolution ". . . was duly adopted at a special meeting of the Quinault Indian *Tribal Council* on the 22nd day of April 1958 . . ." It is signed by the president, secretary and three members designated in the certification as a quorum of the council. Further, the document is marked:

"Approved Apr. 23, 1958
C. W. Ringey
Superintendent
Western Washington Indian Agency."

May 15, 1958, the Governor of Washington issued a proclamation pursuant to RCW 37.12.020, quoted *supra*. It declares that

"The criminal and civil jurisdiction of the State of Washington shall apply to the Quinault Indian people, their reservation, territory, lands and country, and all persons being and residing therein."

The crime with which defendant is charged was allegedly committed August 14, 1959—more than 60 days after the Governor's proclamation. RCW 37.12.030.

Defendant moved to dismiss the information against him on the ground ". . . that the Court [of Grays Harbor County] has no jurisdiction of the subject matter of this action or the person of the defendant." The state countered with a motion to strike, or in the alternative, to deny defendant's motion to dismiss.

Both the state and the defendant served and answered demands for admissions. Upon hearing the motions, the court considered (a) the admissions made; (b) an extended stipulation of counsel; (c) oral testimony; and (d) a multitude of exhibits admitted in evidence. Thus the issues were defined.

The trial court entered findings of fact: (a) the Quinaielt Indian tribe is governed by a basic document designated "By-Laws of the General Council . . ." adopted August 24, 1922; (b) the by-laws provide that the tribal council—the governing body—consists of all adult members of the tribe; (c) the "business committee" of the tribe represents it subject to instructions of the council; (d) the tribal council rejected state civil and criminal jurisdiction over the tribe on at least two occasions; (e) it was the "business committee" of the tribe—not the tribal council—that submitted the resolution of April 22, 1958 to the Governor of the state of Washington (although the resolution, quoted *supra,* purports on its face to be submitted by the *tribal council*).

The trial court concluded: (a) the "business committee" did not have authority to sign and present to the Governor the resolution of April 22, 1958; and (b) the proclamation of the Governor was a ministerial act and was "void from the beginning."

The state appeals from a judgment dismissing the charge against defendant.

Our conclusion that the judgment of dismissal must be reversed and the cause remanded with directions to proceed in accordance with the charge is based on two theses:

First: The courts of Washington do not have jurisdiction to resolve internal disputes of the Quinaielt Indian tribe;

Second: The trial court erred when it declared the May 15, 1958 proclamation of the Governor, issued pursuant to RCW 37.12.020, ". . . a purely ministerial act and . . . void."

A. *The courts of Washington do not have jurisdiction to resolve internal disputes of the Quinaielt Indian tribe.*

The ultimate "internal dispute" is this: Did the Quinaielt Indians whose names appear as president, secretary, and members of the tribal council, now designated in this action as the "business committee," have authority under the by-laws of the tribe to execute the resolution of April 22, 1958, requesting the extension of criminal and civil juris-

diction of the state of Washington to include "the people of the Quinault Indian Reservation"?

Illustrative of the fact that the "business committee" of the Quinaielt tribe may be its "governing body" is (a) the testimony of Francis McCrory, who signed the resolution as secretary of the tribal council; he testified,

". . . After all, the business committee is the sole governing body of the Quinaielt Reservation";

and (b) a letter from the Secretary of the United States Department of the Interior to a member of the Quinaielt tribe in which he states,

"The Quinault Tribe is governed by a document referred to as the Bylaws of the General Council of the Indians of the Quinault Reservation. Section 3 of that document provides for a president, a secretary, a treasurer, and, as amended, a business committee consisting of five members of the tribe. Section 3, with respect to the power of the business committee, provides in part:

" 'It shall be the duty of the business committee to represent the Indians of the reservation in all matters pertaining to the tribe and in all Tribal matters, arising between sessions of the council . . .'

". . .

"The Area Director of the Portland, Oregon Area Office of the Bureau of Indian Affairs, in a letter to the Governor dated July 9, 1958, took cognizance of a petition directed to the Governor asserting that the Quinault Business Committee acted without proper authority in adopting the resolution of April 22, 1958. The Area Director, quoting that portion of Section 3 of the Bylaws of the General Council quoted above, expressed the view that *the Business Committee was properly clothed with authority to adopt the resolution of April 22, 1958. We agree with that view.*" (Italics ours.)

A letter dated August 10, 1958, signed by officers of the tribe, and addressed and delivered to members of the tribe living at Taholah, states:

". . . we of the Quinault reservation retain our inherent belief that ours is a quasi-sovereignty from our treaty with the United States government."

The treaty to which reference is made was negotiated by Isaac I. Stevens, Governor of Washington Territory and

Superintendent of Indian Affairs. It was concluded on the Quinaielt River, July 1, 1855, and at the city of Olympia, January 25, 1856; ratified by the United States Senate March 8, 1859; and proclaimed by the President April 11, 1859. 12 Stat. 971-974.

 It is difficult, if not impossible, to define the legal status of "treaty Indian tribes" in a few words. It is sufficient for the purpose of this opinion to state:

"The whole course of judicial decision on the nature of Indian tribal powers is marked by adherence to three fundamental principles: (1) An Indian tribe possesses, in the first instance, all the powers of any sovereign state. (2) Conquest renders the tribe subject to the legislative powers of the United States and, in substance, terminates the external powers of sovereignty of the tribe, e.g., its power to enter into treaties with foreign nations, but does not by itself *affect the internal sovereignty of the tribe,* i.e., its powers of local self-government. (3) These powers are subject to qualification by treaties and by express legislation of Congress, but, save as thus expressly qualified, full powers of internal sovereignty are vested in the Indian tribes and in their duly constituted organs of government." (Italics ours.) Cohen, Handbook of Federal Indian Law, p. 123.

Were it not for Public Law 280, *supra,* and the implementation of Laws of 1957, chapter 240, *supra,* by certain tribes[2]

---

[2]At the date of this opinion, nine tribes (representing approximately 3,879 enrolled Indians) out of twenty-one tribes (representing approximately 14,714 enrolled Indians) residing in the state of Washington have elected to come under the provisions of Laws of 1957, chapter 240. The names of the tribes and the effective dates of state jurisdiction are as follows:

| Tribe | Date of State Jurisdiction |
|---|---|
| Skokomish | September 28, 1957 |
| Muckleshoot | October 25, 1957 |
| Quileute | December 2, 1957 |
| Chehalis | December 13, 1957 |
| Nisqually | January 1, 1958 |
| Tulalip | July 7, 1958 |
| Suquamish | July 14, 1958 |
| Quinaielt | July 14, 1958 |
| Squaxin Island | September 25, 1959 |

The effective dates of state jurisdiction are a matter of public record in the office of the governor. Population figures are from the Bureau

jurisdiction of crimes committed by enrolled Indians on Indian reservations would be in the federal courts.[3]

It appears to us that the "internal dispute," as we have defined it, involves the internal sovereignty and the power of local self-government of the Quinaielt tribe. We find no authority, statute, or decision giving the *courts* of this state jurisdiction to resolve the question of who composes the "governing body" of the Quinaielt Indian tribe.[4] The Quinaielt Indian tribe's control over its elected officials is peculiarly an internal problem and one over which the courts of this state have no jurisdiction.

B. *The trial court erred when it declared the May 15, 1958 proclamation of the Governor, issued pursuant to RCW 37.12.020, ". . . a purely ministerial act and . . . void."*

---

of Indian Affairs, Portland, Oregon, as of June 1, 1957. *U. S. Bureau of the Census. U. S. Census of Population: 1960. General Population Characteristics. Washington. Final Report, PC (1)—49B, Table 15,* page 26, lists the Washington Indian population at 21,076.

[3]*In re Wesley v. Schneckloth,* 55 Wn. (2d) 90, 346 P. (2d) 658 (1959) (grand larceny); *In re Roberts v. Schneckloth,* 55 Wn. (2d) 105, 346 P. (2d) 668 (1959) (second degree assault); *In re Monroe,* 55 Wn. (2d) 107, 346 P. (2d) 667 (1959) (aiding and abetting grand larceny); *In re Charley v. Rhay,* 55 Wn. (2d) 585, 348 P. (2d) 977 (1960) (second degree burglary); *In re White v. Schneckloth,* 56 Wn. (2d) 173, 351 P. (2d) 919 (1960) (assault with intent to commit rape); *In re Arquette v. Schneckloth,* 56 Wn. (2d) 178, 351 P. (2d) 921 (1960) (intentionally taking an automobile).

Civil jurisdiction: See *State ex rel. Adams v. Superior Court,* 57 Wn. (2d) 181, 356 P. (2d) 985 (1960) (dependent minor enrolled Indian); *In re Colwash,* 57 Wn. (2d) 196, 356 P. (2d) 994 (1960) (abandoned minor enrolled Indian).

[4]Interested parties have apparently reached the same conclusion. In an affidavit in support of his motion to dismiss (notarized by one of his court appointed counsel), defendant in the instant case states:

". . . that there is now pending in the United States District Court, Western District of Washington, Southern Division, an action entitled Bowechop et al vs Jackson et al, being Cause No. 2525, the purpose of which action is to declare null and void the action of said five officers in attempting to subject the Quinaielt Tribe of Indians to the criminal and civil jurisdiction of the State of Washington . . ."

The thesis of our second proposition is closely related to the first; it is really "the other side of the coin."

Pursuant to Public Law 280, *supra,* the legislature authorized civil and criminal jurisdiction over Indian tribes upon the fulfillment of certain conditions.

It was for the Governor to determine, as chief executive of the state, that the resolution received by him was from "the tribal council or other governing body" of the Quinaielt Indian tribe. He had to be satisfied that the body presenting the resolution was duly qualified. This required the exercise of his executive discretion. Public officers are presumed to have performed their duty regularly and legally. *Smith v. Hollenbeck,* 48 Wn. (2d) 461, 294 P. (2d) 921 (1956); *Barbee Mill Co. v. State,* 43 Wn. (2d) 353, 261 P. (2d) 418 (1953); *Randles v. State Liquor Control Board,* 33 Wn. (2d) 688, 206 P. (2d) 1209, 9 A. L. R. (2d) 531 (1949). This presumption is even stronger when applied to the Governor. See *People ex rel. Duncan v. Scott,* 134 Colo. 525, 307 P. (2d) 191 (1957), stating:

" . . . The presumption that every public officer does his duty is especially strong in executive actions by the Governor, he being the chief executive officer of the state."

In *State ex rel. McReavy v. Burke,* 8 Wash. 412, 423, 36 Pac. 281 (1894), the court was concerned with the authority of the Governor to remove a member of the state capitol commission. The act creating the commission stated the Governor had power to remove a member for cause. The court stated:

" . . . Again, and most important of all, the act provides for such action *whenever the governor is satisfied that any of the enumerated causes exist.* It does not say how the governor is to be satisfied, *and the manner in which he becomes satisfied cannot be inquired into."* (Italics ours.)

Just as recognition of a foreign government by the United States is a *political* act accepted as conclusive by state and federal courts, so is the May 15, 1958 proclamation by the Governor binding upon the court in the instant case. *Jones v. United States,* 137 U. S. 202, 212, 34 L. Ed. 691, 11 S. Ct. 80 (1890).

The judgment of dismissal is reversed and the case remanded.

OTT, C. J., HILL, DONWORTH, FINLEY, ROSELLINI, HUNTER, and HAMILTON, JJ., concur.