885 P.2d 1104

**The NAVAJO NATION, also known as the Navajo Tribe of Indians, Plaintiff–Appellee,**

v.

**Peter D. MacDONALD, Sr. and Wanda MacDonald, his wife; Byron Terrell "Bud" Brown and Carol E. Brown, husband and wife; Peter D. "Rocky" MacDonald, Defendants–Appellants.**

No. 1 CA–CV 92–0113.

Court of Appeals of Arizona, Division 1, Department B.

May 24, 1994.

As Amended on Motion for Reconsideration June 23, 1994.

Review Denied Dec. 20, 1994.*

---

* Corcoran, J., of the Supreme Court, recused himself and did not participate in the determination of this matter.

Byron T. "Bud" Brown, Carol E. Brown, in pro. per.

Peter D. MacDonald, Jr., in pro. per.

Mariscal, Weeks, McIntyre & Friedlander, P.A. by Phillip Weeks, David J. Ouimette, Phoenix, for appellee.

## OPINION

TOCI, Judge.

## I. INTRODUCTION

Byron T. Brown and Kurion T. Tracy conspired with Peter D. MacDonald, Sr., Chairman of the Navajo Nation Tribal Council, and his son, Peter D. MacDonald, Jr. to defraud the Navajo Nation ("the Tribe") of several million dollars through a double-escrow real estate transaction. When the Tribe discovered the existence of the illegal conspiracy, it filed a civil action against the conspirators in Maricopa County Superior Court. The trial court entered judgment in favor of the Tribe and against Brown, MacDonald, Jr., and MacDonald, Sr.[1] Peter D. "Rocky" MacDonald, Jr., Byron Terrell "Bud" Brown, Carol E. Brown, Peter D. MacDonald, Sr., and Wanda MacDonald all appealed. For the reasons discussed below, we affirm.

### A. MacDonald, Jr.'s Appeal

After filing a notice of appeal, MacDonald, Jr. filed a motion in superior court for relief from the Tribe's judgment, pursuant to Rule 60, Arizona Rules of Civil Procedure. He argued that because the Navajo Nation Supreme Court had vacated his criminal conviction for activities related to the ranch transaction, he was entitled to relief under Rules 60(c)(5) and (d). The trial court denied the motion, finding no basis under Rule 60 for exercising its discretion to set aside the Tribe's judgment.

On appeal, MacDonald, Jr. argues that the trial court lacked subject matter jurisdiction over the Tribe's claims and that the trial court erred by denying his Rule 60 motion for relief from the Tribe's judgment. He also raises eleven other alleged errors that he claims warrant reversal.

We conclude that the trial court properly exercised subject matter jurisdiction over the Tribe's claims against MacDonald, Jr. We also conclude that because MacDonald, Jr. did not appeal the trial court's order denying his Rule 60 motion, we do not have jurisdiction to consider his arguments on this issue. Finally, we conclude that by not raising his remaining arguments in the trial court, MacDonald, Jr. has waived review of those arguments on appeal.

### B. Brown's Appeal

Brown argues first that the portion of the judgment against him for fraud and tortious interference with contract is unsupported by the evidence. Second, he argues that the trial court erred by awarding the Tribe damages, costs, and attorneys' fees under Ariz. Rev.Stat.Ann. ("A.R.S.") section 13–2310(C) (1989) (amended Supp.1993) because it was not in effect at the time the wrongful acts allegedly occurred.

We conclude that the trial court's findings on the Tribe's alternative theories of liability, which Brown does not challenge on appeal, are sufficient to support the judgment against him. We also conclude that because Brown did not raise his second argument in the trial court, he has waived review of the argument on appeal. We therefore affirm.

## II. FACTUAL AND PROCEDURAL HISTORY

■ On appeal, we review the facts in the light most favorable to sustaining the judgment. *Rogus v. Lords*, 166 Ariz. 600, 601, 804 P.2d 133, 134 (App.1991).

In December 1986, after MacDonald, Sr.[2] was re-elected chairman of the Navajo Nation Tribal Council, Tracy[3] and Brown[4] ap-

---

1. Tracy settled with the Tribe before trial.

2. MacDonald Sr. is an enrolled member of the Tribe and was the Chairman of the Tribal Council from 1987 to 1990. He also served as Chairman of the Tribal Council from 1972 through 1983. As Chairman, MacDonald, Sr. was the leader of both the executive and legislative branches of the Tribe's government.

3. Tracy directly or indirectly owned or controlled several corporations, which he used to facilitate the purchase of the ranch and to deceive tribal officials into believing that they were dealing with the true owner of the ranch.

4. Brown was a real estate agent and close personal friend of MacDonald, Sr. During MacDonald, Sr.'s first term as Chairman, Brown served as Chairman of the Tribe's Agricultural

proached him with their plan to defraud the Tribe. Their plan was to purchase the Big Boquillas Ranch ("the ranch") from the Boquillas Cattle Company, a subsidiary of Tenneco West, and simultaneously resell the ranch to the Tribe for a substantial profit. Tracy and Brown, however, needed MacDonald, Sr. to use his authority over the Tribe's legislative and executive branches of government to ensure that the Tribe would purchase the ranch. MacDonald, Sr. agreed to participate in the scheme and said, "I assume I'll be taken care of." The three co-conspirators agreed that Tracy and Brown would split the profits generated by the transaction and that MacDonald, Sr. would receive his share from Brown. The conspirators also agreed that MacDonald, Sr.'s interest in the transaction and the payments made to him would be kept secret.

After he was inaugurated as Chairman, MacDonald, Sr. immediately began using his position, authority, and influence to induce the Tribe to purchase the ranch. He frequently met with the Tribal officials whose approval was needed for the transaction and expressed his support for the deal. He never disclosed, however, that he had a personal financial interest in the transaction. Moreover, he never disclosed that the conspirators intended for Tracy to purchase the ranch from the Boquillas Cattle Company to resell to the Tribe or that Brown was a principal in the transaction rather than an agent.

In exchange for MacDonald, Sr.'s participation, Brown and Tracy paid him secret bribes and kickbacks. Brown arranged for Tracy to wire $25,000.00 to the United New Mexico Bank in Gallup, New Mexico as partial payment on a note which MacDonald, Sr. owed to the bank. Tracy also leased a new BMW 735i automobile for MacDonald, Sr.'s personal use. In addition, Tracy gave Brown a check for $10,000.00, which was used to pay the tuition at a private boarding school that MacDonald, Sr.'s daughters were attending.

In February 1987, Tracy entered into a contract with the Boquillas Cattle Company to purchase the ranch for $26,250,000.00. Although Tracy and Brown both knew that the

Boquillas Cattle Company had previously offered to sell the ranch to other potential buyers for as little as $18,000,000.00, the two of them made no effort to negotiate a purchase price lower than the one offered. They also settled for only one-half of the mineral rights in the ranch land even though they knew that the previous buyers had negotiated sales agreements transferring all of the mineral rights to the buyer. Under the contract, Tracy would not become the legal owner of the ranch until the transaction closed and all required payments were made.

After the purchase agreement with the Boquillas Cattle Company was executed, the conspirators presented an offer to sell the ranch to the Tribe without revealing that the sale would involve a double-escrow. The conspirators falsely represented to the tribe that the Boquillas Cattle Company was the legal owner of the ranch. To conceal his interest in the purchase contract with Boquillas Cattle Company, Tracy changed the name of one of his companies to "Big Boquillas Cattle Company." He purposely chose this name so that the tribal officials would think that they were purchasing the ranch from the Boquillas Cattle Company. Tracy then sent a letter to the Tribe on Big Boquillas Cattle Company stationery, offering to sell the ranch to the Tribe for $33,417,367.00.

Brown and Tracy also retained an attorney to prepare a misleading title opinion about the ownership of the ranch. The opinion falsely represented that the ranch was owned at the time by Big Boquillas Cattle Company. Neither Tracy's interest in the purchase contract with Boquillas Cattle Company nor his interest in the Big Boquillas Cattle Company corporation was disclosed. Brown and Tracy presented the title opinion to the Tribal Council to mislead them about the identity of the owner of the ranch.

On April 30, 1987, the Tribal Council approved the informal proposed agreement to buy the ranch from Tracy's company for $33,417,367.00. At the time, a formal purchase agreement had not yet been prepared. The terms of the proposed agreement pro-

Products Industry Board. Brown also served as an advisor and fund-raiser for MacDonald, Sr.'s 1986 campaign for Chairman of the Tribal Council.

vided for a non-refundable $500,000.00 earnest money deposit, payment of $8,229,344.00 at closing, and payment of the balance of $24,688,032.00 in four equal installment payments. The agreement also provided that the Tribe would receive only one-half of the mineral rights in the ranch property.

When the transaction was approved, tribal officials were unaware of MacDonald, Sr.'s deceit. They were still under the impression that Brown was a real estate agent for the true owner of the ranch. And, they had not discovered MacDonald, Sr.'s covert financial interest in the transaction. In addition, the Tribe did not know that the transaction involved a double-escrow.

Although on April 30, 1987, no formal written purchase agreement existed, MacDonald, Sr. immediately began exerting pressure on the Tribe's administrative employees to complete the transaction. He threatened to fire the director of the Tribe's finance department if the director failed to locate the necessary funds to pay the non-refundable $500,-000.00 earnest money deposit. He also demanded that a Navajo Justice Department attorney prepare a receipt for the deposit over the attorney's objections that the documentation was inadequate. When the attorney voiced his objections, MacDonald, Sr. said, "I want the money paid. You know what I want. Do it." A one-page receipt bearing only the total sales price of the transaction was prepared and the non-refundable deposit was paid.

Although the closing was originally scheduled for July 15, 1987, MacDonald, Sr. moved it forward to July 8, 1987. In June 1987, several articles had appeared in Phoenix and Gallup newspapers that disclosed the double-escrow and other financial details of the transaction. MacDonald, Sr. accelerated the closing because he feared that rising opposition to the transaction might reveal his interest in it or prevent it from occurring.

When tribal members and officials voiced their opposition, MacDonald, Sr. used his authority and influence to obtain their support for the deal. For example, Michael Upshaw, the Tribe's Attorney General, sent a memorandum to MacDonald, Sr. two days before the closing that raised several questions about the propriety of the transaction. MacDonald, Sr. spoke to Upshaw in the Navajo language as an elder of the Tribe would speak to a younger subordinate and personally assured him that the transaction was proper, normal, and essential to the Tribe. Upshaw relied on these assurances and allowed the transaction to close.

On July 8, 1987, the parties met in the offices of two Phoenix title companies to close the sale. The Tribe's representatives, however, nearly prevented the transaction from closing when it became clear that Tracy could not guarantee that the Boquillas Cattle Company would use its mineral rights in the ranch property in conformity with the Tribe's environmental regulations. Although a tribal member telephoned MacDonald, Sr. for instructions on whether to proceed with the closing, he was not available. Nevertheless, John Thompson, the Vice-Chairman of the Tribal Council, told the tribal member that MacDonald, Sr.'s instructions were to close the transaction on whatever terms they could get. The sale was then closed.

MacDonald, Jr. joined the conspiracy in February 1988, after the transaction with the Tribe had closed; he participated in the conspiracy, however, for several months before the Tribe made its final installment payments totalling over $22 million. In furtherance of the conspiracy, he acted as a conduit through which kickback payments were paid to MacDonald, Sr. He also collaborated with Brown to contrive a deceptive explanation for the bribes and kickbacks in order to keep MacDonald, Sr.'s involvement in the conspiracy a secret. To explain the $25,000.00 wire-transfer, MacDonald, Jr. prepared a sham note and consulting agreement between companies controlled by MacDonald, Jr. and Brown. The two co-conspirators then agreed to falsely assert that the $25,000.00 paid to MacDonald, Sr. was an advance on the consulting contract and that the BMW was for MacDonald, Jr.

In November 1988, Brown was subpoenaed to give sworn testimony about the transaction to counsel for the United States Senate Select Committee on Indian Affairs. Before he testified, Brown met with MacDonald, Sr.

and MacDonald, Jr. to discuss what Brown would say in his testimony. All of them agreed that Brown would testify in accordance with the deceptive explanation that he and MacDonald, Jr. had earlier contrived. Brown, however, confessed the scheme to the Senate Committee counsel in exchange for a promise of immunity.[5]

Before the conspiracy was discovered, the Tribe made payments under the purchase agreement of $31,601,691.36. Out of this sum, the conspirators obtained a total profit of $7,136,307.35. In addition, MacDonald, Sr. received roughly $100,000.00 in bribes and kickbacks from Brown and Tracy.

The Tribe charged both MacDonald, Sr. and MacDonald, Jr. with fourteen counts of criminal conduct relating to conspiracy, bribery, fraud, and violations of the Tribe's ethical code. After a trial before the District Court of the Navajo Nation, MacDonald, Sr. was convicted of thirteen counts of criminal conduct and MacDonald, Jr. was convicted of one count of criminal conduct.

On August 11, 1989, the Tribe filed a civil action against the conspirators in Maricopa County Superior Court, alleging fifteen claims for relief. The claims relevant to this appeal are for racketeering in violation of A.R.S. section 13–2310 through 13–2317 (1989 & Supp.1993) ("RICO statute"), fraud, tortious interference with contract, breach of fiduciary duty, and breach of contract. The Tribe requested relief in the form of compensatory damages, treble damages under the RICO statute, punitive damages, a constructive trust, and in the alternative, rescission of the sales contract.

The Tribe moved for summary judgment on its claims against MacDonald, Sr., Tracy, and Brown for rescission of the sales contract and restitution of all monies paid under the contract. The trial court granted the motion, finding that MacDonald, Sr.'s breach of his fiduciary duties was "conclusively established by his convictions for bribery and fraud." The trial court also found that "Brown's involvement in that breach of fiduciary duty [was] conclusively established by his testimony before the U.S. Senate Select

Committee on Indian Affairs." The trial court entered judgment against MacDonald, Sr. and Brown and ordered that they were jointly and severally liable to the Tribe for restitution in at least the amount of $4,211,-404.54. The trial court, however, denied the motion as against Tracy.

The Tribe also moved for summary judgment on its claims for treble damages and punitive damages under the RICO statute. The trial court found that as to MacDonald, Sr. and MacDonald, Jr., the predicate acts of a scheme or artifice to defraud were conclusively established by their criminal convictions. As to Brown, the trial court found that the predicate acts of a scheme or artifice to defraud were conclusively established by his testimony before the Senate Committee. The trial court concluded, however, that issues of fact existed as to causation and the amount of the Tribe's damages.

A nine-day bench trial followed. Brown was present at the trial and participated. MacDonald, Jr., however, waived his right to be present at the trial and did not participate. The claims against the other defendants named in this action were either settled or dismissed before trial.

After all the evidence was presented, the trial court concluded that, under A.R.S. section 13–807 (1989), MacDonald, Jr.'s criminal conviction had collateral estoppel effect. This ruling precluded him from denying in the civil action the essential allegations of the criminal offenses for which he had been convicted. The trial court issued findings of fact and conclusions of law and entered judgment against MacDonald, Sr., Brown, and MacDonald, Jr. In its conclusions of law, the trial court stated:

1. [MacDonald, Sr.] owed both contractual and fiduciary duties to the [Tribe] as its chief elected official and its employee, which he breached....

2. Brown and Tracy conspired and colluded between themselves and with [MacDonald, Sr.] to induce [MacDonald, Sr.] to dishonestly breach his fiduciary and contractual duties to the [Tribe]....

---

5. Because the transcript of Brown's testimony before the Senate Committee counsel was not included in the record on appeal, we are unable to discuss the testimony in greater detail.

3. ... Brown and Tracy tortiously interfered with [MacDonald, Sr.'s] contractual relationship with the [Tribe].

4. ... Brown, Tracy, [MacDonald, Sr.], and [MacDonald, Jr.] each knowingly and deliberately entered into a scheme and artifice to deprive the [Tribe] of the right to [MacDonald, Sr.'s] honest services (within the meaning of A.R.S. § 13–2301(D) and 13–2310(C) (R.I.C.)) [sic] and each of them benefitted financially from that scheme.

5. ... [MacDonald, Jr.] was both a knowing participant/co-conspirator and an aider and abettor of the scheme ..., but there is no evidence his participation occurred prior to February of 1988....

6. Brown, Tracy, [MacDonald, Sr.], and [MacDonald, Jr.] unjustly profited from the scheme....

7. Pursuant to A.R.S. § 13–807, the conviction of [MacDonald, Sr.] and [MacDonald, Jr.] in the [Tribe's] District Court precludes them from denying the claims made in this cause and those convictions have a collateral estoppel effect in this law suit [sic].

 ....

9. The marital communities of Byron T. Brown and Carol E. Brown, and of Peter MacDonald, Sr. and Wanda LeClere MacDonald are liable along with the individual defendants Brown and [MacDonald, Sr.] for the actions of those individual defendants.

The trial court ordered that MacDonald, Sr. and Brown were liable to the Tribe for damages and restitution in the amount of $7,136,307.35. The trial court further ordered that MacDonald, Jr. was liable to the Tribe for $2,688,862.35 in tort damages. The court then trebled both amounts under the RICO statute to $29,985,898.95 and $10,745,160.69 respectively. This appeal followed.

## III. DISCUSSION

### A. Issues Raised by MacDonald, Jr.

#### 1. Subject Matter Jurisdiction

MacDonald, Jr. contends that the trial court lacked subject matter jurisdiction over the Tribe's civil action because the exercise of state jurisdiction infringed upon the Tribe's right of self-government. The Tribe, on the other hand, argues that the superior court had jurisdiction because the Tribe's lawsuit arose out of a transaction having substantial off-reservation contacts with the State of Arizona. We agree with the Tribe. We conclude that the trial court properly exercised jurisdiction.

■ We begin our analysis by pointing out that Arizona has not sought to extend Arizona's civil and criminal jurisdiction to Indian reservations through the mechanism provided in 25 U.S.C. sections 1321–1326 (1988) ("Public Law 284").[6] *Nenna v. Moreno*, 132 Ariz. 565, 566, 647 P.2d 1163, 1164 (App.1982) (citing *Francisco v. State*, 113 Ariz. 427, 431, 556 P.2d 1, 5 (1976)). Thus, as a general rule, Arizona courts may not exercise subject matter jurisdiction over transactions arising on Indian reservations. *Nenna*, 132 Ariz. at 566, 647 P.2d at 1164.

Nevertheless, in *Nenna* we recognized an exception to this general rule. The issue before us in *Nenna* was whether the superior court had jurisdiction to enter a support order under the Uniform Reciprocal Enforcement of Support Act in favor of a California resident and against an Indian resident of the Papago Indian Reservation. To decide this issue, we looked to the Montana Supreme Court's decision in *Montana ex rel. Flammond v. Flammond*, 190 Mont. 350, 621 P.2d 471 (1980), for guidance. There, the Montana court stated that "Montana may not exercise subject matter jurisdiction over transactions arising on Indian reservations *unless the transaction entails 'significant' or 'substantial' contacts with the state outside*

---

6. Public Law 284 provides, in relevant part:

 Notwithstanding the provisions of any enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this subchapter.

 25 U.S.C. § 1324 (1988).

*of reservation boundaries." Id.* 621 P.2d at 472 (citations omitted) (emphasis added). Applying the *Flammond* test to the facts in *Nenna,* we held that the trial court did not have jurisdiction to enter an order for support because there were "absolutely no off-reservation acts in Arizona sufficient to vest the courts of this state with jurisdiction over ... a reservation Indian." *Nenna,* 132 Ariz. at 566, 647 P.2d at 1164.

■ Here, however, the Tribe's lawsuit arose out of a transaction in which the contacts with the State of Arizona outside of reservation boundaries were both significant and substantial. The Big Boquillas Ranch itself, the subject matter of the fraudulent conspiracy, is located on land beyond the reservation. The $25,000.00 wire-transfer to the United New Mexico Bank was made by Tracy from Arizona. The BMW automobile provided for MacDonald, Sr. was leased from an automobile dealership in Phoenix. The deceptive explanation for the $25,000.00 wire-transfer and the BMW automobile was contrived by Brown and MacDonald, Jr. at a meeting in Phoenix. Finally, the closing of the double-escrow transaction occurred at the offices of two title companies in Phoenix. Thus, we conclude that these substantial contacts vest the trial court with jurisdiction over the Tribe's lawsuit.

MacDonald, Jr. cites *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), to support his argument that the exercise of jurisdiction by the trial court infringed upon the Tribe's right of self-government. We find *Williams* factually distinguishable from this case. In *Williams,* the Court rejected an effort by a non-Indian to sue in state court to collect on a debt incurred by an Indian on the reservation. The Court held that the tribal court had an overriding interest in adjudicating disputes between Indians and non-Indians arising from business transactions occurring wholly on reservation lands. *Id.* at 223, 79 S.Ct. at 272. Here, unlike in *Williams,* the transaction giving rise to the Tribe's lawsuit had significant contacts with the state outside of reservation boundaries. Consequently, *Williams* does not control this case.

MacDonald, Jr. relies on *Littell v. Nakai,* 344 F.2d 486 (9th Cir.1965), *cert. denied,* 382 U.S. 986, 86 S.Ct. 531, 15 L.Ed.2d 474 (1966), as additional support for his argument. *Littell* is also factually distinguishable from this case. In *Littell,* the General Counsel and Claims Attorney of the Navajo Tribe, a non-Indian, brought suit to enjoin the Chairman of the Navajo Tribal Council from interfering with the General Counsel's performance of his contract with the Navajo Tribe. *Id.* at 487. The General Counsel alleged that the Chairman (1) sought to have him removed as General Counsel, (2) prevented him from appearing before the Tribal Council when in session, (3) had him forcibly ejected from the Council Chamber, and (4) prohibited the Tribe from paying him fees of $10,000.00. *Id.* The court held that the trial court did not have subject matter jurisdiction because the General Counsel's lawsuit involved matters concerning the Tribe's internal affairs. *Id.* at 490.

Unlike *Littell,* this case was brought by the Tribe itself against a tribal member to recover funds obtained from the Tribe through a fraudulent conspiracy, most of which occurred outside the reservation. The Tribe's complaint does not raise any issues concerning the scope of the Chairman's authority over the Tribe's executive and legislative branches of government. Consequently, *Littell* has no application to these facts.

MacDonald, Jr.'s final argument is that the exercise of state jurisdiction infringed upon the Tribe's right of self-government. In support of this argument, MacDonald, Jr. cites *Washington v. Bertrand,* 61 Wash.2d 333, 378 P.2d 427 (1963). The issue in *Bertrand,* however, was whether the "business committee" of the Quinaielt Indian Tribe was the Tribal governing body with authority to execute a resolution requesting that the State of Washington extend Public Law 280 jurisdiction to the reservation. *Id.* 378 P.2d at 429–30. The Supreme Court of Washington held that the state courts were without jurisdiction to resolve the question of who composed the "governing body" of the tribe. According to the *Bertrand* court, the tribe's "control over its elected officials is peculiarly an internal problem over which the courts of this

state have no jurisdiction." *Id.* 378 P.2d at 431. The case against MacDonald, Jr., however, does not involve a question concerning the Tribe's control over its elected officials. Consequently, *Bertrand* is not applicable to these facts.

■■■ The Tribe is entitled to the same rights as other citizens and residents, including the right of access to Arizona courts, unless the exercise of such rights interferes with tribal self-government. *See* Felix S. Cohen, *Handbook of Federal Indian Law* § B.1, at 645, § B.2.d(2), at 651 (Richard Strickland et al. eds., 1982 ed.). And, if the claim arises outside Indian country, a lawsuit in state court based on such claim generally does not implicate a tribe's right of self-government. *See Fisher v. District Court of Montana,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) (right of Indian plaintiff to bring adoption proceeding in state court preempted by right of tribal self government where substantial part of conduct occurred on the reservation); Cohen, *supra,* § C.2.a, at 350 n. 15 ("state courts usually have jurisdiction over Indians where the cause of action or some material event occurs outside Indian country"). Because the transaction in this case involved substantial off-reservation contacts with Arizona, there is no infringement on the Tribe's right of self-government. Thus, we conclude that the trial court properly exercised jurisdiction over the Tribe's lawsuit.

### 2. Rule 60 motion

■■■ MacDonald, Jr. next argues that because his criminal conviction was vacated and the criminal charges against him were dismissed, the trial court erred by denying his Rule 60, Arizona Rules of Civil Procedure, motion for relief from the civil judgment. The Tribe argues that we do not have jurisdiction to consider this issue because it was not contained in MacDonald, Jr.'s notice of appeal. We agree with the Tribe. In *Lee v. Lee,* 133 Ariz. 118, 124, 649 P.2d 997, 1003 (App.1982), we held, "[i]n the absence of a timely notice of appeal, ... we are without jurisdiction to determine the propriety of the order sought to be appealed." *See also China Doll Restaurant, Inc. v. Schweiger,* 119

Ariz. 315, 316, 580 P.2d 776, 777 (App.1978) ("Since this action was not contained in the notice of appeal, and in fact occurred approximately two months after the notice of appeal was filed, we acquired no jurisdiction to determine this issue."). Here, MacDonald, Jr. filed his notice of appeal before the trial court decided his Rule 60 motion, and he did not file another notice of appeal after the trial court issued its decision. Accordingly, because we lack jurisdiction to decide this issue on appeal, we do not consider it on its merits.

### 3. Waived Claims

■■ McDonald, Jr. also argues that the trial court erred by: (1) giving his criminal conviction collateral estoppel effect in the civil action, (2) finding his marital community liable for the Tribe's damages, (3) finding that he violated the RICO statute, (4) applying the RICO statute retroactively, (5) finding him liable for fraud, (6) finding him liable as a co-conspirator, (7) failing to admit evidence of post-sale offers for the ranch at trial, (8) rejecting his defense that the Tribe failed to mitigate their damages, (9) measuring the Tribe's damages incorrectly, and (10) by trebling the Tribe's damages under the RICO statute. He further argues that the Tribe violated an order in the civil action that prohibited the parties from providing information obtained through civil discovery to criminal prosecutors.

We have reviewed the record and conclude that MacDonald, Jr. did not raise these arguments in the trial court. Because this court will not consider arguments raised for the first time on appeal, *Stewart v. Mutual of Omaha Ins. Co.,* 169 Ariz. 99, 108, 817 P.2d 44, 53 (App.1991), we decline to consider these arguments on their merits.

### B. Issues Raised by Brown

### 1. Sufficiency of the evidence

■■■ Brown argues that the trial court erred because no evidence exists to support the judgment against him on the Tribe's claims for fraud and tortious interference with contract. We reject this argument. Here, in addition to the claims for fraud and

tortious interference with contract, the Tribe's pleadings raised claims for racketeering, breach of fiduciary duty, and breach of contract. The trial court found that Brown was liable for racketeering under A.R.S. section 12–2310(C), and that he conspired to induce MacDonald, Sr. to breach both his fiduciary and contractual duties to the Tribe. On appeal, Brown has not challenged these findings, any one of which was sufficient to support the trial court's judgment.

These uncontested, alternative theories of liability were framed by the pleadings, and any error in the trial court's findings has been waived by Brown's failure to address the sufficiency of the evidence to support them. *See Jones v. Burk,* 164 Ariz. 595, 597, 795 P.2d 238, 240 (App.1990). "It is well-settled law that a reviewing court must affirm a judgment if possible on any theory framed by the pleadings and supported by the evidence." *Earthworks Contracting, Ltd. v. Mendel–Allison Constr. of California, Inc.,* 167 Ariz. 102, 109, 804 P.2d 831, 838 (App.1990). We conclude, therefore, that the trial court's findings on these alternative theories of liability are sufficient to support the judgment against Brown.

### 2. RICO claim

█ Brown next argues, for the first time on appeal, that because A.R.S. section 13–2310(C) was not effective at the time the alleged wrongful acts occurred, the trial court erred by awarding the Tribe damages, costs, and attorneys' fees under such section. Because Brown did not raise this issue in the trial court, we do not consider the issue on its merits. *See Stewart,* 169 Ariz. at 108, 817 P.2d at 53.

### IV. CONCLUSION

For the reasons stated above, we conclude that the trial court properly entered judgment in favor of the Tribe. We therefore affirm.

WEISBERG, P.J., and CONTRERAS, J., concur.