GOLDEN HILL PAUGUSSETT TRIBE OF INDIANS *v.*
TOWN OF SOUTHBURY ET AL.
(15019)
(15020)

PETERS, C. J., and CALLAHAN, BERDON, KATZ and PALMER, Js.

Argued September 27, 1994—decision released January 3, 1995

*Michael D. O'Connell*, with whom was *Matthew W. DenOuden*, for the appellant (plaintiff).

*Mark R. Kravitz*, with whom were *Penelope I. Bellamy* and, on the brief, *Jeremy G. Zimmermann, Jeffrey R. Babbin* and *Noel E. Hanf*, for the appellee (named defendant).

*Richard Blumenthal*, attorney general, with whom were *Gregory T. D'Auria*, assistant attorney general, and, on the brief, *Arnold B. Feigin*, assistant attorney general, for the appellee (intervening defendant state of Connecticut).

PETERS, C. J. The dispositive issue in this consolidated appeal is the extent of the jurisdiction of the Superior Court to inquire into a plaintiff's authority to bring a lawsuit in the name of an Indian tribe. The plaintiff, representing itself to be the Golden Hill Paugussett Tribe of Indians (plaintiff), brought an action to quiet title to land located in the town of Southbury (town). In its complaint, the plaintiff requested that the town be designated representative of a proposed defendant class of current owners of that land. The state of Connecticut (state) and a party representing itself as the General Tribal Council of the Golden Hill Paugussett Indian Nation (council) moved separately to intervene as defendants, and the trial court granted both motions. Thereafter, the defendants separately moved to dismiss the action on the grounds that, inter alia, the plaintiff had no authority to bring this lawsuit in the name of the tribe. After an evidentiary hearing, the trial court found that the tribe had not authorized the suit and rendered judgment dismissing the action. The plaintiff appealed from the judgment

of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm.

This action arises out of events that are alleged to have occurred more than 300 years ago. In its complaint, the plaintiff claimed that its tribe, from time immemorial until the arrival of English colonists, had possessed, occupied and controlled much of present-day southwestern Connecticut. The plaintiff further claimed that, in a deed of 1706, the tribe had transferred to a group of colonists the tribe's Indian title to certain lands, but had "reserved" to the tribe the land now in dispute. The plaintiff admitted that, in the years 1733 to 1759, a series of additional deeds had purported to transfer to the colonists the reserved land as well. The plaintiff contended, however, that those later deeds had been void ab initio, because the transfers had occurred without the Colonial General Court's express consent in violation of General Court enactments of 1663, 1680 and 1717. In light of the alleged invalidity of the later deeds, the plaintiff contended that its "Indian title"[1] in the reserved land never had been properly extinguished, and, therefore, that it has a present right to occupy the land.

After filing its complaint, the plaintiff filed a notice of lis pendens in the Southbury town clerk's office and began to serve copies of the notice on all 1200 recorded current owners of the land. Alleging that the lis pendens was causing irreparable harm to the current land-

[1] "[A]lthough fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation [Great Britain] and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act." *Oneida Indian Nation of New York* v. *Oneida*, 414 U.S. 661, 667, 94 S. Ct. 772, 39 L. Ed. 2d 73 (1974).

owners by making their titles uninsurable, the town filed motions for a temporary injunction against continued service of the notice of lis pendens and for discharge of the lis pendens itself. After a hearing, the trial court granted both motions.[2]

Thereafter, all three defendants moved to dismiss the action on the grounds that the lawsuit, although brought in the name of the tribe, actually had not been authorized by the tribe. The trial court held an evidentiary hearing on the motions to dismiss, at which the plaintiff refused, on grounds of tribal sovereignty, to offer any evidence of its authority to sue on behalf of the tribe, other than copies of documents filed with the governor pursuant to General Statutes § 47-66i.[3] Those documents did not directly authorize any individual to

[2] The trial court concluded that service of the notice of lis pendens was not necessary in this case, as, inter alia, "the very nature of Indian land claims [is that] hundreds of years and thousands of good faith purchases are claimed to be of no effect." It further concluded that the lis pendens was itself improper, as there was no probable cause to support the plaintiff's claimed title in the subject property.

[3] General Statutes § 47-66i provides: "METHOD OF SELECTING TRIBAL LEADERS. DISPUTES. (a) Each tribal leader shall file with the governor his name and a written description of the method of selecting tribal leaders and the process by which tribal leaders exercise their authority. The governor shall file such description with the secretary of the state and the Indian Affairs Council established under section 47-59b.

"(b) A leadership dispute shall be resolved in accordance with tribal usage and practice. Upon request of a party to a dispute, the dispute may be settled by a council. Each party to the dispute shall appoint a member to the council and the parties shall jointly appoint one or two additional members provided the number of members of the council shall be an odd number. If the parties cannot agree on any joint appointment, the governor shall appoint any such member who shall be a person knowledgeable in Indian affairs. The decision of the council shall be final on substantive issues. An appeal may be taken to the superior court to determine if provisions of the written description filed with the secretary of the state pursuant to this section have been followed. If the court finds that the dispute was not resolved in accordance with the provisions of the written description, it shall remand the matter with instructions to reinstitute proceedings, in accordance with such provisions."

sue on behalf of the tribe, but they did indicate that the tribe's "leader" was its "Traditional Chief," Chief Big Eagle. The documents also indicated that Chief Big Eagle had appointed his son, Chief Quiet Hawk, to be the tribe's "Council Chief." Although neither Chief Big Eagle nor Chief Quiet Hawk testified at the hearing, the parties stipulated that someone identifying himself as Chief Quiet Hawk had authorized the plaintiff's counsel to file the lawsuit.

In support of their motions to dismiss, the defendants offered testimony, which the trial court found credible, that Chief Quiet Hawk lacked authority to sue on behalf of the tribe. R. Michael Smith, a member of the tribe, testified that (1) notwithstanding the documents filed with the governor, the tribe was governed by an elected tribal council, (2) only the council could authorize a lawsuit in the name of the tribe and (3) in this case, the council specifically had decided not to authorize the action. Michael S. Haney, executive director of the American Indian Arbitration Institute, confirmed that pursuant to the customs and practices of the Golden Hill Paugussetts, only the tribal council could authorize a lawsuit in the name of the tribe. Haney testified, further, that a survey of the tribe's members disclosed no one who supported Chief Quiet Hawk in the bringing of the lawsuit. After finding that "the Council, and not Quiet Hawk, has control of the group calling themselves members of the tribe" and that the council "wishes the case withdrawn," the trial court granted the motions to dismiss.[4]

---

[4] The trial court provided three alternative reasons for its decision to dismiss the case. First, the trial court noted that if "a tribe is a group or band of Indians following a leader," the court was required to dismiss for lack of standing because "[t]he designated plaintiff in this lawsuit is . . . not a tribe or representing a tribe . . . ." The trial court explained that, because "[n]o other members of the group calling themselves members of the Golden Hill Tribe of Indians support the bringing of this lawsuit on Quiet Hawk's authority . . . no tribe exists which followed Quiet Hawk at the

On appeal, the plaintiff argues, for two reasons, that the trial court improperly dismissed the case.[5] First, the plaintiff maintains that the trial court had no jurisdiction to determine whether the plaintiff actually had power to act in the name of the tribe, as that question was a matter of tribal sovereignty not cognizable in civil court. Second, the plaintiff contends that, even if the trial court had jurisdiction to determine whether the plaintiff had authority to sue, the court was bound to make that determination solely on the basis of the documents filed with the governor pursuant to § 47-66i and was required to allow this suit to proceed because the individual who had authorized the suit was listed in those documents as a "leader" of the tribe. We disagree with both arguments.

I

The plaintiff's initial claim is that the trial court exceeded its jurisdiction when it decided that the plaintiff lacked authority to sue in the name of the tribe.[6]

time suit was filed [that] may be designated as the plaintiff Golden Hill Paugussett Tribe of Indians." Second, the trial court held that if its determination of the plaintiff's standing implicated an "issue of disputed tribal leadership," it was required to dismiss because such issues were "unsuited to judicial inquiry" and "reserved by the Legislative Branch for resolution by a tie breaker appointed by the Executive Branch." Third, the trial court held that if it did have "inherent jurisdiction to determine the identity and capacity of a party filing a lawsuit," it would be required to dismiss because, as a matter of fact, Quiet Hawk had no authority to sue on the tribe's behalf. We affirm the trial court's judgment only on the last of these three grounds. Like the trial court, we offer no opinion as to who *did* have authority to sue on the tribe's behalf, and affirm only the finding that Quiet Hawk did not have such authority.

[5] The plaintiff also argues on appeal that the trial court should not have imposed the temporary injunction against service of the notice of lis pendens or discharged the lis pendens. Because we affirm the trial court's determination that the plaintiff lacked authority to sue, however, these other issues on appeal are moot, and we need not reach them. See *Patterson* v. *Council on Probate Judicial Conduct*, 215 Conn. 553, 561–62, 577 A.2d 701 (1990).

[6] Because the plaintiff does not raise the issue on appeal, we have no occasion to decide whether the individuals who purportedly authorized the suit,

The plaintiff's claim requires us to examine the interrelationship of three propositions: (1) courts always have jurisdiction to determine whether they have jurisdiction; (2) courts lack jurisdiction over suits brought in the names of parties by persons unauthorized to sue on behalf of those parties; and (3) instrumentalities of the state have no jurisdiction over the internal affairs of bona fide Indian tribes. In essence, the plaintiff asks us to hold that the third proposition superseded the first two—that is, that because of tribal sovereignty, the trial court had no power to decide the jurisdictional question of whether the plaintiff had authority to sue on the tribe's behalf. In the circumstances of this case, however, we need not decide whether a tribe's inherent sovereignty outweighs a court's inherent power to decide its jurisdiction. Contrary to the plaintiff's implicit assertion, we are persuaded that all three propositions not only are compatible in this case, but are complementary, and that the trial court respected all of them by dismissing the action.

A

We first address the trial court's power to determine its jurisdiction. As we have held repeatedly, the power to determine its jurisdiction is one of the core inherent powers of a court. "[O]nce the question of lack of jurisdiction of a court is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case. . . . [A] court must have jurisdiction

including Chief Quiet Hawk, could have sued in their own names to quiet title to the disputed lands. Compare *United States* v. *Dann*, 873 F.2d 1189, 1196 (9th Cir.), cert. denied, 493 U.S. 890, 110 S. Ct. 234, 107 L. Ed. 2d 185 (1989), (individual Indians may sue to enforce Indian title if their lineal ancestors held and exclusively occupied, as individuals, particular tract of land from time immemorial), with *Epps* v. *Andrus*, 611 F.2d 915, 917–18 (1st Cir. 1979), and cases cited therein (only tribe, but not individual tribal member, has standing to sue under Indian Nonintercourse Act to reclaim tribal lands transferred in violation of that act).

to determine its own jurisdiction once that has been put in issue." (Citations omitted; internal quotation marks omitted.) *Castro* v. *Viera*, 207 Conn. 420, 429–30, 541 A.2d 1216 (1988); accord *Chrysler Credit Corp.* v. *Fairfield Chrysler-Plymouth, Inc.*, 180 Conn. 223, 227, 429 A.2d 478 (1980); *Aaron* v. *Conservation Commission*, 178 Conn. 173, 178, 422 A.2d 290 (1979).

As we also have held, "[i]t is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has  .  .  .  some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." (Internal quotation marks omitted.) *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 693, 600 A.2d 1019 (1991); *Ardmare Construction Co.* v. *Freedman*, 191 Conn. 497, 501, 467 A.2d 674 (1983). The standing requirement is "designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 223, 602 A.2d 1019 (1992); *Board of Pardons* v. *Freedom of Information Commission*, 210 Conn. 646, 649, 556 A.2d 1020 (1989); *Maloney* v. *Pac*, 183 Conn. 313, 320, 439 A.2d 349 (1981).

To fulfill these goals, the standing doctrine requires a plaintiff to demonstrate two facts. First, the complaining party must be a "proper party to request adjudication of the issues." *Nye* v. *Marcus*, 198 Conn. 138, 141, 502 A.2d 869 (1985). Second, the person or persons who prosecute the claim on behalf of the complaining party must have authority to represent the party. See, e.g., *Orsi* v. *Senatore*, 230 Conn.

459, 470, 645 A.2d 986 (1994) (standing of foster parent to sue child's guardian on behalf of child); *State* v. *Nardini*, 187 Conn. 109, 112–16, 445 A.2d 304 (1982) (standing of state's attorney to challenge recommendation of sentence review division on behalf of state); *Barrett* v. *Southern Connecticut Gas Co.*, 172 Conn. 362, 370, 374 A.2d 1051 (1977) (standing of shareholder to file derivative action on behalf of corporation); *Vaitekunene* v. *Budrys*, 156 Conn. 547, 554, 244 A.2d 408 (1968) (standing of legatee's purported attorney to appeal order of Probate Court on behalf of legatee).

A complaining party ordinarily can show that it is "a proper party" when it "makes a colorable claim of [a] direct injury [it] has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." (Citations omitted; internal quotation marks omitted.) *Rose* v. *Freedom of Information Commission*, supra, 221 Conn. 223–24; *Board of Pardons* v. *Freedom of Information Commission*, supra, 210 Conn. 649; *Maloney* v. *Pac*, supra, 183 Conn. 321.

To demonstrate authority to sue, however, it is not enough for a party merely to show a "colorable claim" to such authority. Rather, the party whose authority is challenged has the burden of convincing the court that the authority exists. See *Orsi* v. *Senatore*, supra, 230 Conn. 470; *Vaitekunene* v. *Budrys*, supra, 156 Conn. 554; see also *Meredith* v. *Ionian Trader*, 279 F.2d 471, 474 (2d Cir. 1960) ("A party to . . . a suit may by motion or pleading dispute the authority of the opposing party 'to act for the party in whose name he is proceeding, and, if the authority is not shown, the court will dismiss the action for want of parties before it.' "). The burden of proof for questions of authority is higher than that for questions of propriety because

the former questions are more important. Lawsuits must be authorized not only to ensure that the litigants " 'fairly and vigorously' " represent the party's views; *Rose* v. *Freedom of Information Commission,* supra, 221 Conn. 223; but also because, if unauthorized lawsuits were allowed to proceed, future rights of the named parties might be severely impaired. Because of the doctrines of collateral estoppel (issue preclusion) and res judicata (claim preclusion), parties named in an unauthorized suit might later be unable to relitigate issues decided in that suit or to bring new claims. *Barrett* v. *Southern Connecticut Gas Co.*, supra, 172 Conn. 371.

In this case, as it was not disputed that the tribe itself had at least "a colorable claim of [a] direct injury [it] ha[d] suffered . . . in an individual or representative capacity"; (internal quotation marks omitted) *Rose* v. *Freedom of Information Commission,* supra, 221 Conn. 223; the motions to dismiss did not allege that the *tribe* was not a "proper party" to bring an action to quiet title to the disputed lands. The motions to dismiss argued only that the *person* who had brought suit on behalf of the tribe lacked authority to do so. In light of the precedents cited above, those motions properly called into question the jurisdiction of the trial court and required the court to determine its jurisdiction.

B

The plaintiff alleges, however, that even if a court normally is empowered to investigate a litigant's authority to represent a party, the court does not have such power here, because any exercise of that power would violate the inherent sovereignty of the tribe. To avoid interfering with tribal sovereignty, according to the plaintiff, the trial court was required to accept the plaintiff's assertion that it had authority to sue and therefore was required to adjudicate the merits of the plaintiff's case.

Interestingly, the state joins the first part of the plaintiff's argument, agreeing that the trial court lacked jurisdiction to resolve who had authority to sue, because doing so interfered with the sovereignty of the tribe. From this agreement with the plaintiff, however, the state draws the opposite conclusion. The state reasons that, because the trial court had no power to decide who had authority to sue, the court was unable to make an affirmative finding that the plaintiff had standing, and thus it could not exercise jurisdiction over the case.

We agree with both the plaintiff and the state that our courts may not interfere with tribal sovereignty. We disagree with both parties, however, that the trial court's decision as to whether the plaintiff had authority to sue on behalf of the tribe amounted to such an interference. On the contrary, greater threats to tribal sovereignty are posed by the positions taken by the plaintiff and the state than by the actions of the trial court.

Like all instrumentalities of the state of Connecticut, our courts are powerless to intervene in the exercise of tribal self-government. Federal statute, federal common law and state statute all require us to treat bona fide Indian tribes as sovereign nations and to protect tribal rights to self-determination. *Schaghticoke Indians of Kent, Connecticut, Inc.* v. *Potter*, 217 Conn. 612, 626–29, 587 A.2d 139 (1991).[7] Because of the continuing inherent sovereignty of Indian tribes, for example, federal common law forbids states from "unlawfully infring[ing] on the right of reservation Indians to make

[7] As the plaintiff's claim in this case concerns lands outside the current borders of "Indian country"; see *Schaghticoke Indians of Kent, Connecticut, Inc.* v. *Potter*, supra, 217 Conn. 620; and as none of the parties has pointed us to any federal statute addressing a state court's jurisdiction to decide who has authority to sue on behalf of a tribe, we will focus our inquiry only on the jurisdictional limits imposed by federal common law and state law.

their own laws and be ruled by them." (Internal quotation marks omitted.) *White Mountain Apache Tribe* v. *Bracker*, 448 U.S. 136, 142, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980); *Williams* v. *Lee*, 358 U.S. 217, 220, 79 S. Ct. 269, 3 L. Ed. 2d 251 (1959). Similarly, state statutes explicitly provide that "the indigenous tribes, [including] . . . the Golden Hill Paugussett are self-governing entities possessing powers and duties over tribal members and reservations. Such powers and duties include the power to . . . (2) determine the tribal form of government . . . and (5) determine tribal leadership in accordance with tribal practice and usage." General Statutes § 47-59a (b).[8] Any action by a state court that infringed on tribal sovereignty or interfered in tribal self-government would therefore be improper.

Our recognition of tribal sovereignty does not, however, render all matters touching upon tribal decisions nonjusticiable. As the United States Supreme Court has made clear, tribal sovereignty does not impede state court jurisdiction unless "the exercise of state-court jurisdiction in [the] case would interfere with the right of tribal Indians to govern themselves under their own

---

[8] General Statutes § 47-59a provides: "CONNECTICUT INDIANS; CITIZENSHIP, CIVIL RIGHTS, LAND RIGHTS. (a) It is hereby declared the policy of the state of Connecticut to recognize that all resident Indians of qualified Connecticut tribes are considered to be full citizens of the state and they are hereby granted all the rights and privileges afforded by law, that all of Connecticut's citizens enjoy. It is further recognized that said Indians have certain special rights to tribal lands as may have been set forth by treaty or other agreements.

"(b) The state of Connecticut further recognizes that the indigenous tribes, the Schaghticoke, the Paucatuck Eastern Pequot, the Mashantucket Pequot, the Mohegan and the Golden Hill Paugussett are self-governing entities possessing powers and duties over tribal members and reservations. Such powers and duties include the power to: (1) Determine tribal membership and residency on reservation land; (2) determine the tribal form of government; (3) regulate trade and commerce on the reservation; (4) make contracts; and (5) determine tribal leadership in accordance with tribal practice and usage."

laws." *Three Affiliated Tribes of the Fort Berthold Reservation* v. *Wold Engineering, P. C.,* 467 U.S. 138, 148, 104 S. Ct. 2267, 81 L. Ed. 2d 113 (1984). If the exercise of state court jurisdiction is "compatible with tribal autonomy"; id., 149; judicial action not only is permitted, but may be required. See id., 151–52 (suggesting that failure to exercise jurisdiction could violate Indians' rights under due process clause, equal protection clause and 42 U.S.C. § 1981).

The question before us, therefore, is whether, in deciding if the plaintiff had authority to sue on behalf of the tribe, the trial court actually interfered with the exercise of tribal sovereignty. Notwithstanding the plaintiff's and the state's arguments, we are persuaded that the trial court's actions were consistent with such sovereignty. By determining whether the suit had been brought by the tribe, the trial court preserved the autonomy of the tribe to choose its own form of government (i.e., government by tribal council) and enforced the tribe's sovereign decision not to sue.[9]

The propriety of the trial court's actions is further established by a decision of the United States Supreme Court, in a case strikingly similar to the case at bar,

---

[9] Although the state cites Felix S. Cohen's monumental treatise, Handbook of Federal Indian Law (reprint 1986) (1942) p. 126, to support its proposition that courts are powerless to examine whether an individual represents an Indian tribe, Cohen actually supports the opposite principle. Cohen wrote: "The question of whether action taken in the name of an Indian tribe is in truth tribal action, has been before state and federal courts on many occasions, and in every case the courts have held that the definition of the form of tribal government is a matter for the decision of the Indians themselves." Id. To ensure that "the decision of the Indians themselves" are upheld, Cohen continued, courts are obligated to decide, based on tribal law, whether an individual had authority to represent a tribe: "Not only must officers presuming to act in the name of an Indian tribe show that their acts fall within their allotted function and authority, but likewise the procedural formalities which tradition or ordinance require must be followed in executing an act within the acknowledged jurisdiction of the officer or set of officers." Id., p. 127; see also id., pp. 126–28 and nn.34 and 46.

more than sixty years ago. In *Pueblo of Santa Rosa* v. *Fall*, 273 U.S. 315, 317, 47 S. Ct. 361, 71 L. Ed. 658 (1927), as in this case, a suit had been filed in the name of an Indian tribe pursuant to a power of attorney executed by a man who purported to be the "Captain" or chief of the tribe. The defendant, by way of a motion to dismiss, alleged that counsel had no authority to sue in the name of the tribe. Id., 319. At an evidentiary hearing, the defendant offered evidence of "inquiries, conducted among the Indians . . . [that] failed to disclose anyone who knew of any authority from the Indians to bring or maintain the suit. . . . The evidence further show[ed] that no suit properly could have been brought without the prior consent of the Indians in council and that no council for that purpose was ever assembled. . . . Indeed, there [was] no evidence to the contrary worthy of serious consideration." Id., 318–20. The proper result, the court declared, was that the trial court should "dismiss the bill, on the ground that the suit was brought by counsel without authority . . . ." Id., 321.[10]

Had the trial court followed the plaintiff's or the state's suggested courses of action, on the other hand, it would have risked a substantial infringement of tribal sovereignty. If, as the plaintiff desired, the suit had gone forward, the tribe might later have been precluded from relitigating issues decided against the plaintiff, or barred from bringing new claims not raised by the plaintiff. Likewise, if, as the state desired, the suit had been dismissed because there was a "dispute" about who was authorized to sue on behalf of an Indian tribe, the tribe might be forever foreclosed from bringing

---

[10] See also *Meredith* v. *Ionian Trader*, supra, 279 F.2d 473–74 (following *Pueblo of Santa Rosa* v. *Fall*, supra, 273 U.S. 315, dismissing suit by insurer of damaged cargo because statements of cargo's owner, the sovereign government of Pakistan, showed that insurer had no authority to sue on owner's behalf).

even an authorized lawsuit in its own name.[11] Cf. id., 321 (cautioning that trial court should dismiss unauthorized suit only without prejudice to "the bringing of any other suit hereafter by and with the authority of the alleged Pueblo of Santa Rosa"). Both parties' suggestions, therefore, lead to results far more detrimental to tribal sovereignty than the path followed by the trial court.

In conclusion, we reiterate that the inherent sovereignty of Indian tribes bars courts from intervening in many matters of tribal self-government. The principle of tribal sovereignty, however, does not bar courts from acting to protect tribal sovereignty and thus did not bar the actions of the trial court in this case.

## II

The plaintiff's second claim is that, even if the trial court was empowered to decide whether the plaintiff was authorized to sue on behalf of the tribe, the court was required to decide the issue of standing solely on the basis of documents filed with the governor pursuant to § 47-66i. We disagree.

We note, first, that the statute itself does not require a trial court to look only to § 47-66i documents when deciding a litigant's authority to sue. The statute's only stated purpose in requiring the documents to be filed is to limit a court's role in reviewing an optional dis-

---

[11] The state suggests that the trial court would only need to wait until the dispute had been resolved pursuant to the arbitration procedures outlined in § 47-66i. Because those statutory procedures are discretionary, however, a court has no guaranty that the dispute ever would be submitted for resolution. In addition, the state does not explain how a court could prevent opposing parties from making false allegations that there were "disputes" as a means to deprive the court of jurisdiction. If, as the state contends, a court has no power to hear evidence on the internal decision-making processes of the tribe, the court apparently would have to find that there was a bona fide "dispute," and then dismiss the case, whenever anyone challenged a litigant's standing to sue on behalf of a tribe.

pute resolution mechanism also established by the statute. The statute provides that *"[u]pon request* of a party to a dispute, the dispute *may"* be submitted to a panel of three arbitrators. (Emphasis added.) General Statutes § 47-66i (b). On appeal from the arbitral procedure, the statute then directs the Superior Court to determine "if provisions of the written description filed . . . pursuant to this section have been followed" and to vacate the decision and remand the case to the arbitrators if "the dispute was not resolved in accordance with the provisions of the written description." General Statutes § 47-66i (b). Section 47-66i, therefore, is consistent with other legislation limiting the scope of judicial review of consensual arbitration awards.[12] See General

[12] The statutory language, its legislative history, and policy considerations all support our conclusion that § 47-66i does not require disputing parties to submit to arbitration before a court can determine an individual's authority to sue. In the same statute providing that disputes "may" be submitted to arbitration, the legislature also provided that disputes "shall" be resolved in accordance with tribal usage and practice, that parties submitting to arbitration "shall" each appoint one arbitrator, that the governor "shall" appoint a tie-breaking arbitrator if the parties cannot agree on a joint appointment, that the arbitrators' decision "shall" be final on substantive issues, that an appeal from the arbitration award "may" be taken to the Superior Court, and that the court on appeal "shall" remand the case to the arbitrators if the dispute was not resolved in accordance with the written documents. "This use of shall and may in the same statute, which is commonly mandatory and directory in connotation is a factor that evidences affirmative selectivity of terms with specific intent to be distinctive in meaning. The words shall and may must then be assumed to have been used with discrimination and a full awareness of the difference in their ordinary meanings." (Internal quotation marks omitted.) *Builders Service Corp.* v. *Planning & Zoning Commission,* 208 Conn. 267, 304–305, 545 A.2d 530 (1988); *Jones* v. *Civil Service Commission,* 175 Conn. 504, 509, 400 A.2d 721 (1978); *Mazzola* v. *Southern New England Telephone Co.,* 169 Conn. 344, 365 n.19, 363 A.2d 170 (1975); *Shulman* v. *Zoning Board of Appeals,* 154 Conn. 426, 428–29, 226 A.2d 380 (1967). There is no legislative history contradicting the clear language of the statute and suggesting that disputants were to be *required* to submit to arbitration before a court could determine an individual's authority to sue on behalf of a tribe. Moreover, because § 47-66i constrains the arbitrators to decide a dispute "in accordance with the provisions of the written description," policy con-

Statutes § 52-418 (a).[13] Because nothing in the legislative history otherwise suggests, we are persuaded that the legislature, in enacting § 47-66i, did not intend to limit the Superior Court's role in deciding whether an individual had authority to represent a tribe in an action brought to the Superior Court in the first instance.[14]

---

siderations counsel against reading the statute to require arbitration on questions of authority to sue. If we refused to recognize disputants' statutory rights to opt out of the arbitration procedure, disputants theoretically would become bound by documents they alleged to be inaccurate or fraudulent. See following text.

[13] General Statutes § 52-418 (a) provides: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, any judge thereof, shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

[14] We furthermore decline to hold that notwithstanding the optional nature of § 47-66i arbitration, the trial court should have stayed the action until such time as arbitration occurred, pursuant to the doctrine of "primary jurisdiction." See *Golden Hill Paugussett Tribe of Indians* v. *Weicker*, 39 F.3d 51, 58 (2d Cir. 1994); *Sharkey* v. *Stamford*, 196 Conn. 253, 256, 492 A.2d 171 (1985); *Mazzola* v. *Southern New England Telephone Co.*, 169 Conn. 344, 349, 363 A.2d 170 (1975). None of the parties has argued in this case that the arbitration panels established by § 47-66i are "administrative bod[ies]" having "special competence" over the question of authority to sue on behalf of an Indian tribe. (Internal quotation marks omitted). *Mazzola* v. *Southern New England Telephone Co.*, supra, 349. Nor has any party explained how an arbitration decision identifying an individual as a tribe's "leader" pursuant to § 47-66i would "materially ai[d]" the court in determining whether that leader had authority to sue on the tribe's behalf. *Golden Hill Paugussett Tribe of Indians* v. *Weicker*, supra, 60 (question of tribal existence within special competence of Bureau of Indian Affairs [BIA]; BIA's decision will aid District Court in deciding tribe's claim under Non-Intercourse Act).

Our conclusion is buttressed by the limited reliability of the documents contemplated by § 47-66i with respect to a leader's actual authority to act on behalf of a tribe. On its face, the statute empowers any individual purporting to be the "leader" of a tribe to file documents confirming his leadership and power. The statute provides no procedure to guarantee that the tribe consents to the contents of the documents before they are filed by its purported leader.[15] Cf. 25 U.S.C. § 476.[16] The statute also establishes no procedure by which the executive officials who receive the documents can inquire into the documents' provenance. Cf. *State* v. *Bertrand*, 61 Wash. 2d 333, 341, 378 P.2d 427 (1963) (before issuing resolution effectuating decision of tribal counsel, governor must be "satisfied that the body presenting the resolution was duly qualified").[17] If the

---

[15] We do not mean to suggest that the documents would have to be approved democratically to be valid. The tribe's right to choose its own form of government surely allows it to choose a nondemocratic government. Even nondemocratic governments, however, derive their legitimacy only from the consent of the governed. The tribal documents, therefore, cannot accurately represent the choices of the tribe unless made with the consent of the tribe, however such consent is expressed.

[16] Title 25 of the United States Code, § 476 provides in relevant part: "ORGANIZATION OF INDIAN TRIBES; CONSTITUTION AND BYLAWS AND AMENDMENT THEREOF; SPECIAL ELECTION

"(a) ADOPTION; EFFECTIVE DATE

"Any Indian tribe shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, and any amendments thereto, which shall become effective when . . . ratified by a majority vote of the adult members of the tribe or tribes at a special election authorized and called by the Secretary . . . .

"(b) REVOCATION

"Any constitution or bylaws ratified and approved by the Secretary shall be revocable by an election open to the same voters and conducted in the same manner as provided in subsection (a) of this section for the adoption of a constitution or bylaws."

[17] Because the statute similarly does not contemplate an exercise of executive discretion in recognizing and/or accrediting the tribal leaders listed in the documents, we need not consider whether it would be appropriate for our courts to defer to the exercise of that discretion, much as courts defer to the decisions of the United States president as to who represents

statute were read, therefore, to preclude courts from looking behind such documents and considering evidence offered by tribal members that their leaders had not been authorized to sue, tribal sovereignty and self-determination would be significantly impaired.

In sum, the documents filed pursuant to § 47-66i will constitute evidence of a purported tribal leader's authority only to the extent that the trial court finds those documents to be reliable and accurate. In this case, the trial court found, as a matter of fact, that the documents were unreliable, and that the lawsuit had not been authorized by the tribe. As the plaintiff has raised no challenge to the trial court's findings of fact, and as we have rejected the plaintiff's challenges to the legal standards employed by the trial court, we accordingly conclude that the trial court acted appropriately.[18]

The judgment is affirmed.

In this opinion CALLAHAN, KATZ and PALMER, Js. concurred.

BERDON, J., dissenting. The majority today holds that our state courts have jurisdiction to interfere with the

---

a foreign sovereign. See, e.g., *Bank of China* v. *Wells Fargo Bank*, 104 F. Sup. 59, 66 (N.D. Cal. 1952), aff'd, 209 F.2d 467 (9th Cir. 1953); *State* v. *Bertrand*, supra, 61 Wash. 2d 341 (applying international law principles to recognition of Indian tribes).

[18] We reject, for two reasons, the plaintiff's final argument that even if we affirm the reasoning of the trial court, we should still reverse the judgment and remand the case to allow the plaintiff to offer additional evidence of its authority to sue on behalf of the tribe. The plaintiff maintained, at oral argument in this court, that it withheld such evidence at the initial hearing only because it feared that introduction of the evidence would waive its challenge to the jurisdiction of the trial court to decide who had authority to sue. This argument, however, is supported neither by legal precedent nor by the factual record in this case, the latter of which indicates that the plaintiff persisted in its refusal to offer evidence at the hearing even after the defendants had stipulated, on the record, that they would not argue that the plaintiff had waived its jurisdictional challenge. We therefore decline to grant the plaintiff's request.

governance and leadership structure of the sovereign Indian nation known as the Golden Hill Paugussett Tribe by determining whether the person who authorized this litigation has authority to sue on behalf of the tribe.[1] I believe that our courts either lack jurisdiction to make such a determination or, at the very least, must yield primary jurisdiction over this determination to the special council established by the legislature to resolve such disputes.

## I

The laws of both the United States and Connecticut recognize that Indian tribes are sovereign nations free to establish their own method of government and to exist according to those laws. "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory . . . they are a separate people possessing the power of regulating

---

[1] At the outset, I must point out that I agree with the majority that litigation must only be instituted by persons or entities that have standing. See *Unysis Corp.* v. *Dept. of Labor*, 220 Conn. 689, 693, 600 A.2d 1019 (1991). A plaintiff has standing if "he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." (Internal quotation marks omitted.) Id. Indeed, a plaintiff must have standing in order for a court to assert subject matter jurisdiction over the litigation. Id.

Nevertheless, the question here is not so much one of *standing* but one of *authorization* to bring suit. The named plaintiff, the Golden Hill Paugussett Tribe, clearly has standing to assert a right to its aboriginal lands. See *Oneida Indian Nation of New York* v. *New York*, 691 F.2d 1070, 1081 (2d Cir. 1982). The only question is whether the person who has instituted the litigation on behalf of the tribe, Aurelius H. Piper, Jr., whose Indian name is Chief Quiet Hawk, has been authorized by the tribe to do so. Challenges to one's authority to bring suit have been made in innumerable ways, including an affirmative defense in the pleadings; *Vishipco Line* v. *Chase Manhattan Bank, N.A.*, 660 F.2d 854 (2d Cir. 1981), cert. denied, 459 U.S. 976, 103 S. Ct. 313, 74 L. Ed. 2d 291 (1982); or a motion to vacate service and summons of complaint; *Sterling Industries, Inc.* v. *Ball Bearing Pen Corp.*, 298 N.Y. 483, 84 N.E.2d 790 (1949); or a motion to dismiss; *Meredith* v. *Ionian Trader*, 279 F.2d 471 (2d Cir. 1960). I agree that a defendant should be able to raise such an issue early in the proceedings.

their internal and social relations . . . ." (Citations omitted; internal quotation marks omitted.) *United States* v. *Mazurie,* 419 U.S. 544, 557, 95 S. Ct. 710, 42 L. Ed. 2d 706 (1975). Indeed, the state of Connecticut has specifically recognized the Golden Hill Paugussett Tribe as a self-governing entity "possessing powers and duties over tribal members and reservations. Such powers and duties include the power to: (1) Determine tribal membership and residency on reservation land; (2) determine the tribal form of government; (3) regulate trade and commerce on the reservation; (4) make contracts; and (5) determine tribal leadership in accordance with tribal practice and usage." General Statutes § 47-59a (b).

Allowing a tribe of Indians to choose its leader in the way it sees fit necessarily means allowing it to decide what powers and duties that leader is to possess. The Indians, for example, must be allowed to determine for themselves whether their leader possesses plenary powers to represent their interests in any manner he deems necessary or whether he must answer to a governing body of some sort. Similarly, the Indians must be allowed to decide for themselves whether their leader represents their interests on all concerns, or only on a limited range of narrowly framed issues. The majority, however, usurps the rights of the Indians to make these fundamental choices by holding that the trial court had a duty to receive evidence on this intratribal dispute and to determine whether the Indians had authorized their acknowledged chief to bring this action. The majority defends its action by paternalistically suggesting that it actually is protecting the rights of the Indians to self-determination, and that refusing to so hold would "lead to results far more detrimental to tribal sovereignty." Such a decision is, in my view, an unnecessary infringement on the rights of a sovereign people.

The state legislature, not only recognizing the state's interest in knowing what form of governance a tribe has adopted and who represents the tribe but also concerned with the sovereignty of the Indian tribes, has established a procedure providing for out-of-court resolution of intratribal disputes. In 1987, the state legislature, by special act, established the Legislative Task Force on Indian Affairs (task force) to research all aspects of Indian life. Special Acts 1987, No. 87–103. The act specifically authorized the task force to study and make recommendations for legislation involving the process for determining tribal membership; Special Acts 1987, No. 87-103, § (a) (4); and the rights of tribal government. Special Acts 1987, No. 87-103, § (a) (5). The task force consisted of Indians from each of the five tribes recognized by the state of Connecticut including the Golden Hill Paugussett Tribe, legislators and members of the state executive branch. Special Acts 1987, No. 87-103, § (b).

After more than one year of research, the task force proposed to the legislature a carefully crafted mechanism that provided for the resolution of intratribal governance and leadership disputes in a manner that is deferential to the sovereignty of the Indian tribes. The legislature adopted the recommended procedure in essentially unchanged form when it adopted No. 89-368, § 18, of the 1989 Public Acts, which has been codified as General Statutes § 47-66i.

Section 47-66i, entitled "Method of selecting tribal leaders. Disputes,"[2] establishes a two-pronged mech-

---

[2] General Statutes § 47-66i provides: "METHOD OF SELECTING TRIBAL LEADERS. DISPUTES. (a) Each tribal leader shall file with the governor his name and a written description of the method of selecting tribal leaders and the process by which tribal leaders exercise their authority. The governor shall file such description with the secretary of the state and the Indian Affairs Council established under section 47-59b.

"(b) A leadership dispute shall be resolved in accordance with tribal usage and practice. Upon request of a party to a dispute, the dispute may be set-

anism for state recognition of Indian leadership and the out-of-court resolution of intratribal disputes. First, the statute requires documentary filings with the state describing each tribe's method of governance and identifying the tribe's leader. Second, the statute creates a detailed dispute resolution procedure through which intratribal leadership disputes can be resolved without resort to a court of law.

Under the documentary prong of this scheme, each tribal leader is required to file with the governor his name, a written description of the method the tribe uses to select tribal leaders and the process by which tribal leaders exercise their authority. General Statutes § 47-66i (a). That statute requires that the governor, in turn, file this document with the secretary of the state and the Indian Affairs Council.[3] General Statutes § 47-66i (a).

The dispute resolution prong provides that any intratribal leadership dispute shall be resolved in accordance with tribal usage and practices. General Statutes § 47-66i (b). In the case of such a controversy, § 47-66i (b) provides a minimally intrusive, out-of-court procedure to resolve it in accordance with tribal law by appointing a dispute resolution council to be the final

tled by a council. Each party to the dispute shall appoint a member to the council and the parties shall jointly appoint one or two additional members provided the number of members of the council shall be an odd number. If the parties cannot agree on any joint appointment, the governor shall appoint any such member who shall be a person knowledgeable in Indian affairs. The decision of the council shall be final on substantive issues. An appeal may be taken to the superior court to determine if provisions of the written description filed with the secretary of the state pursuant to this section have been followed. If the court finds that the dispute was not resolved in accordance with the provisions of the written description, it shall remand the matter with instructions to reinstitute proceedings, in accordance with such provisions."

[3] The Indian Affairs Council includes a representative of each of the five tribes recognized by the state including the Golden Hill Paugussett Tribe. General Statutes § 47-59b.

arbiter: "Upon request of a party to a dispute, the dispute may be settled by a council. Each party to the dispute shall appoint a member to the council and the parties shall jointly appoint one or two additional members provided the number of members of the council shall be an odd number. If the parties cannot agree on any joint agreement, the governor shall appoint any such member who shall be a person knowledgeable in Indian affairs. The decision of the council shall be final on substantive issues." General Statutes § 47-66i (b).

Although § 47-66i (b) provides for judicial oversight of the dispute resolution procedure, the statute strictly limits the role of the court. Section 47-66i (b) allows either party to appeal the decision of the council to the Superior Court, but makes clear that the court may only review the actions of the council to determine whether it followed the tribe's practices as those practices are described in the documents filed with the governor and the secretary of the state pursuant to the documentary prong of § 47-66i. If the court finds error in the council's decision, the court's sole available remedy is to remand the dispute to the council so that the council may reconsider its decision. General Statutes § 47-66i (b). In other words, under the statute, a state court has no authority whatsoever to substitute its findings, beliefs or conclusions about the tribe's leadership or governance for that of the council.

This dispute resolution procedure, particularly under the circumstances of this case, must be interpreted as providing the exclusive means for resolving the leadership and governance questions here in issue. I reach this conclusion for several reasons.

First, this procedure was painstakingly crafted by the task force and the legislature as a means of ensuring the sovereignty of the Indian nations.[4] Indeed, the

---

[4] Representative Andrew Norton, who was a member of the task force, remarked on the bill in the House of Representatives that "the tribe has

members of the task force intended that the procedure "will become the format for settling any dispute over leadership"; 32 H.R. Proc., Pt. 31, 1989 Sess., p. 10897, remarks of Representative Andrew Norton; and that state courts would have only a limited role in the process. For example, Representative Norton, a member of the task force, explained during the debate on the floor of the House of Representatives that in case of an appeal to the Superior Court, the court's only role is "to determine if the procedures have been followed faithfully." Id.

The legislature, of course, has authority to define the subject matter jurisdiction of Connecticut state courts. See *State* v. *Curcio*, 191 Conn. 27, 30, 463 A.2d 566 (1983). As Chief Justice Peters wrote for the majority in *Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 764–65, 628 A.2d 1303 (1993), in determining whether the legislature has erected a barrier to our subject matter jurisdiction, " 'we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . .' " All of these factors compel the conclusion that the legislature, in approving § 47-66i, intended to make the dispute resolution council the exclusive means for resolving intratribal conflicts and thereby clearly circumscribed the jurisdiction of state courts to make such determinations. See *State* v. *Piper*, Superior Court, judicial district of New London, Docket Nos. CR21-57349, CR21-57446 (August 12, 1994, 12 Conn. L. Rptr. 137, 138–39) (holding that similar procedural provisions in General Statutes § 47-66j for determin-

every right to pick its own method of leadership. The state only asks that we have a copy of that format so that in cases of dispute it can be referred to . . . ." 32 H.R. Proc., Pt. 31, 1989 Sess., p. 10896.

ing tribal membership strip state courts of subject matter jurisdiction).[5]

Second, the Golden Hill Paugussett Tribe endorsed the procedures established by § 47-66i. Aurelius H. Piper, Sr., whose Indian name is Chief Big Eagle, was, at all times material to this dispute, and remains the traditional chief of the Golden Hill Paugussett Tribe.[6] Chief Big Eagle, representing the Golden Hill Paugussett Tribe, was a member of the task force which specifically recommended to the legislature the dispute

---

[5] The majority, in its pursuit to uphold the dismissal of this case and thereby temporarily dispose of the vexing issues it raises, dismisses this minimally intrusive procedure as merely one that the parties may or may not choose to employ. The majority argues that the statute indicates only that a party to the dispute "may" submit the dispute to a panel of three arbitrators, and that the procedure, therefore, is discretionary. It is well established, however, that the "word 'may' when used in a statute is to be interpreted as mandatory rather than directory if the context of the statute permits it and it is necessary to do so in order to make the statute effective to carry out the legislative intent." *Harp* v. *Urban Redevelopment Commission,* 162 Conn. 525, 530, 294 A.2d 633 (1972); see *State ex rel. Markley* v. *Bartlett,* 130 Conn. 88, 93, 32 A.2d 58 (1943); *Lake Garda Co.* v. *LeWitt,* 126 Conn. 588, 590–91, 13 A.2d 510 (1940); *Capobinco* v. *Samorak,* 102 Conn. 310, 313, 128 A. 648 (1925). Clearly, the intent of the legislature in this case was to establish an effective means for the resolution of intratribal disputes that allowed for only limited review by state courts. Moreover, a statute should be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation. *Dukes* v. *Durante,* 192 Conn. 207, 214, 471 A.2d 1368 (1984); *LaProvidenza* v. *State Employees' Retirement Commission,* 178 Conn. 23, 29, 420 A.2d 905 (1979). Under these circumstances, the dispute resolution procedure set out in § 47-66i must be deemed mandatory and, therefore, a limitation on the authority of the court to consider these intratribal disputes.

[6] No party to this action disputes Chief Big Eagle's continuing authority as traditional tribal chief. "The Golden Hill Paugussetts are the state's only traditionally governed Tribe: whereas the other four tribes now have elected tribal chairmen and tribal councils, the Paugussett Chief is appointed by the clan mother." Legislative Task Force on Indian Affairs, Report to General Assembly, Feb., 1989, p. 1, reprinted in Conn. Joint Standing Committee Hearings, Environment, Pt. 8, 1989 Sess., p. 2461. Clan mother Ethel Sherman Piper Baldwin Peters appointed Chief Big Eagle the traditional tribal chief in 1959.

resolution procedure now embodied in § 47-66i. Chief Big Eagle's son, Kenneth L. Piper, whose Indian name is Moonface Bear and who maintains in this action that the intervening General Tribal Council of the Golden Hill Paugussett Tribe has sole authority to institute legal action on behalf of the tribe,[7] was the alternate representative for the tribe on the task force. It is fundamental that statutes which affect the leadership of Indian tribes, "when adopted with the advice and consent of the Indians themselves, have been accorded special weight." F. Cohen, Handbook of Federal Indian Law (reprint 1986) (1942) p. 127. The involvement of Chief Big Eagle, the undisputed traditional chief of the Golden Hill Paugussett Tribe, and Moonface Bear in the drafting and enactment of § 47-66i strongly indicates that the tribe approves of these provisions and expects to be governed by them.

Third, the individual parties involved in this lawsuit have indicated that they are not only aware of the statute's provisions, but have taken steps to comply with them. The record reveals that Moonface Bear was the first member of the Golden Hill Paugussett Tribe to

[7] The record indicates that Moonface Bear is not without his problems with either the tribe or the state. The tribal documents on file with the secretary of the state indicate that both Chief Big Eagle and Chief Quiet Hawk banished Moonface Bear from the tribe in April, 1993—several months prior to the filing of this lawsuit—and revoked any powers he held with respect to the tribe. Therefore, according to these documents, at no time relevant to the issues involved in this case did Moonface Bear hold a position of leadership in the tribe.

The state, meanwhile, has charged Moonface Bear with three counts of selling unstamped cigarettes in violation of General Statutes § 12-304 (b) (1), two counts of conspiracy to sell unstamped cigarettes in violation of General Statutes §§ 53a-48 and 12-304 (b) (1), one count of interfering with a police officer in violation of General Statutes § 53a-167a, one count each of threatening and coercion in violation of General Statutes §§ 53a-62 and 53a-192, respectively, one count of conspiracy to commit threatening and coercion in violation of General Statutes § 53a-48, and one count of possessing and offering for sale 20,000 or more unstamped cigarettes in violation of § 12-304 (b). *State* v. *Piper*, supra, 12 Conn. L. Rptr. 138.

file any documents with the governor and the secretary of the state pursuant to § 47-66i (a).[8] In these documents, filed in 1990, Moonface Bear identified himself merely as "warchief and Reservation Chief of Colchester" and he acknowledged the continuing authority of Chief Big Eagle. Aurelius H. Piper, Jr., whose Indian name is Chief Quiet Hawk, filed his own documents with the state in February, 1993, and again in August, 1993. These documents, which were signed by both Chief Big Eagle and Chief Quiet Hawk, indicate that Chief Big Eagle had named Chief Quiet Hawk as the "council chief," a sub-chief of the Golden Hill Paugussett Tribe, and that Chief Big Eagle had delegated all of his powers to Chief Quiet Hawk at that time. Also, these documents include a signed statement from Moonface Bear acknowledging that Chief Quiet Hawk is the council chief.

Accordingly, in order to give effect to the intent of the legislature in adopting § 47-66i, the clear endorsement of those provisions by the Golden Hill Paugussett Tribe, and the actions of individual Indians of that tribe in attempting to comply with these provisions, I would hold that an individual who is currently identified as the leader of the tribe in the documents on file in the secretary of the state's office is presumptively the leader of the tribe. Any other member of the tribe who wishes to contest either the filing party's position as tribal leader or the filing party's authority to engage in particular acts must follow the procedure outlined in § 47-66i.[9]

---

[8] Moonface Bear's documents, dated January 25, 1990, were received in the secretary of the state's office on February 22, 1990.

[9] The majority contends that the dispute resolution council cannot conclusively decide issues of Indian governance and leadership because the council must resolve the dispute "in accordance with the provisions of the written description" which are filed with the secretary of the state pursuant to § 47-66i (a). According to the majority, an Indian who disputed his tribe's

It is undisputed that Chief Quiet Hawk, who authorized this action to be brought in the name of the Golden Hill Paugussett Tribe, is designated as the council chief in the documents on file with the secretary of the state. It is also undisputed that Moonface Bear and the other individuals who purport to represent the intervening General Tribal Council of the tribe have failed to file superseding documentation and have failed to initiate the dispute resolution procedures established by § 47-66i (b). Instead, they have attempted to circum-

leadership might therefore "become bound by documents [he] alleged to be inaccurate or fraudulent."

This is a narrow and incorrect reading of the statute. Indeed, such a reading presumes that tribal documents, once filed pursuant to § 47-66i, can never be updated to reflect changes in tribal leadership and that the dispute resolution council is unable to determine the authenticity of documents filed. Each of these presumptions is flawed.

First, there is nothing in the statute to prevent a member of the tribe who claims to be the rightful leader from filing another explanation of the practices the tribe follows in choosing its leader and its form of governance. Indeed, the majority recognized this fact elsewhere in its opinion, when it stated that "the statute empowers any individual purporting to be the 'leader' of a tribe to file documents confirming his leadership and power." In the case of the Golden Hill Paugussett Tribe, for example, several individuals have filed documents describing the scope of their leadership and the tribe's process of governance. Moonface Bear filed documents in 1990 under his authority as "warchief and Reservation Chief of Colchester." Chief Quiet Hawk filed documents in February, 1993, and in August, 1993, under his authority as "council chief." Chief Big Eagle filed documents in July, 1993, under his authority as "traditional chief." Clearly, the majority's presumption that no superseding documents can ever be filed is incorrect.

Second, because the statute allows the filing of superseding documents, the dispute resolution council is necessarily authorized to determine which filing is authentic in order to resolve the leadership dispute. Indeed, this is the very purpose of requiring the members of the council to be either appointed by the parties or "knowledgeable in Indian affairs." In a case of contradictory filings, the council would simply determine which set of filed documents accurately represents the tribe's leadership structure, and then would determine which of the contending parties was properly chosen the leader. In the case of an appeal to Superior Court, the court would determine whether the council properly determined, based upon the documents it found to be authentic, who was the proper leader and the powers he possesses.

vent these procedures by intervening in this action in order to challenge the authority of Chief Quiet Hawk. The courts of this state simply may not interfere in such a dispute.

## II

Even if I were to assume that state courts have jurisdiction to determine the governance and leadership of the Golden Hill Paugussett Tribe, I would hold that the court must first defer to the jurisdiction and fact-finding capacity of the dispute resolution council established by § 47-66i.

Under the doctrine of primary jurisdiction, a court must yield jurisdiction over an issue to an administrative panel created by the legislature to deal with such issues. "Primary jurisdiction applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or *is materially aided by*, the resolution of threshold issues, usually of a factual nature, which are placed within *the special competence* of the administrative body." (Emphasis added.) *Golden Hill Paugussett Tribe of Indians* v. *Weicker*, 39 F.3d 51, 58–59 (2d Cir. 1994). Indeed, the doctrine applies "where the subject of court litigation is 'at least arguably protected . . . by another regulatory statute.' . . ." Id., 59, quoting *Ricci* v. *Chicago Mercantile Exchange*, 409 U.S. 289, 300, 93 S. Ct. 573, 34 L. Ed. 2d 525 (1973).

This court has held that the doctrine of primary jurisdiction "comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." (Internal quotation marks omitted.) *Mazzola* v. *Southern New England Telephone Co.*, 169 Conn. 344,

349, 363 A.2d 170 (1975). "Ordinarily, a court should not act upon subject matter that is peculiarly within the agency's specialized field without giving the agency an opportunity to apply its expertise . . . ." *Sharkey* v. *Stamford,* 196 Conn. 253, 256, 492 A.2d 171 (1985). Indeed, the doctrine of primary jurisdiction dictates that a court must direct a dispute filed in court to the proper administrative body "so as to take advantage of [that body's] specialized skills and procedures . . . ." (Citations omitted.) *Cianci* v. *Connecticut Council, AFSCME,* 8 Conn. App. 197, 201, 512 A.2d 232 (1986).

*At the very least,* the legislature intended to vest primary jurisdiction over intratribal leadership disputes with the council established by § 47-66i. First, the council is designed to be composed of individuals who have some special interest or knowledge in Indian affairs. Indeed, the statute provides that the Indians themselves should choose at least some of the council members. In the event the parties to the dispute are unable to agree on joint appointments to the council, the governor "shall appoint any such member who shall be a person knowledgeable in Indian affairs." General Statutes § 47-66i (b). Second, in providing for judicial oversight of the process, the legislature limited the role of the courts to verifying purely technical questions of procedure.[10] In accordance with the doctrine of primary jurisdiction, therefore, this court must yield jurisdiction over the dispute between the intervening Indians and Chief Quiet Hawk to the council established by § 47-66i.

Indeed, the Second Circuit Court of Appeals took exactly this position in the recent case of *Golden Hill Paugussett Tribe of Indians* v. *Weicker,* supra, 39 F.3d 51. In *Weicker,* which involved the same group at issue in this case, the defendants challenged whether

---

[10] See footnote 4 and accompanying text of dissenting opinion.

the plaintiff was a "tribe" within the meaning of the Indian Trade and Intercourse Act of July 22, 1790, c. 33, 1 Stat. 137, codified as reenacted and amended at 25 U.S.C. § 177 (1988). The Second Circuit Court of Appeals, acknowledging that the District Court had jurisdiction to make this determination, nevertheless ordered that court to stay judicial proceedings until the federal Bureau of Indian Affairs (BIA) could assume primary jurisdiction and thereby determine whether the Golden Hill Paugussett Tribe satisfied the BIA's criteria for tribal status. *Golden Hill Paugussett Tribe of Indians* v. *Weicker,* supra, 60.[11]

In so holding, the Second Circuit Court of Appeals noted that a court and an agency which specializes in a particular subject matter "are not like two trains, wholly unrelated to one another, racing down parallel tracks towards the same end. Where a statute confers [subject matter] jurisdiction over a general subject matter to an agency and that matter is a significant component of a dispute properly before the court, it is desirable that the agency and the court go down the same track— although at different times—to attain the statute's ends by their coordinated action. . . . The BIA's resolution of these factual issues regarding tribal status will be of considerable assistance to the district court in ulti- mately deciding Golden Hill's . . . claims." Id., 59–60.

The same reasoning which compelled the Second Cir- cuit Court of Appeals to defer to the expertise of the BIA should compel this court likewise to defer to a non- judicial decision maker—the council established by § 47-66i—for resolution of the specialized leadership issues here in dispute.[12]

---

[11] The Second Circuit Court of Appeals allowed the Golden Hill Paugus- sett Tribe to reapply to the trial court for a ruling on the merits if the BIA had not ruled on its tribal status within eighteen months.

[12] The majority ingenuously suggests that it will not defer to the dispute resolution council because no party has "explained how an arbitration deci-

## III

Under these circumstances, I would reverse the trial court's dismissal of this action. I also would order on remand that if Moonface Bear or another member of the tribe renews a challenge to the authority of Chief Quiet Hawk to prosecute this action, the trial court should stay proceedings in order to allow the challenging party to proceed pursuant to § 47-66i (a), thus resolving the dispute over the leadership and the governance of the tribe. See *Golden Hill Paugussett Tribe of Indians* v. *Weicker*, supra, 39 F.3d 60 (staying judicial proceedings while the agency with primary jurisdiction, the BIA, determined whether the plaintiff satisfied its criteria for tribal status).

Furthermore, if this litigation proceeds on the merits, the trial court should consider, subject to any constitutional or other challenges, the impact on this litigation of two recent acts of the legislature: Special Acts, Spec. Sess., Oct., 1993, No. 93-1, and Public Acts, Spec. Sess., Oct., 1993, No. 93-4, § 1, amending General Statutes § 52-325. The former act validates any land transfers that occurred more than sixty years prior to the effective date of the act and that were otherwise valid "except for the possible fact that the general assembly or its predecessor legislative bodies or other governmental authorities did not confirm, validate, ratify or approve such transfers . . . ." Special Acts, Spec. Sess., Oct., 1993, No. 93-1. The latter act prohibits a party from recording a notice of lis pendens based upon

---

sion identifying an individual as a tribe's 'leader' pursuant to § 47-66i would 'materially ai[d]' the court in determining whether that leader had authority to sue on the tribe's behalf." The statute, however, empowers the council to resolve not only who is a tribe's leader, but also a tribal "leadership dispute." The council, therefore, is capable of determining not only who represents the tribe but also what type of authority he has traditionally possessed. The council's determination on this point would certainly "materially aid" a court in its decision.

litigation alleging "an illegal, invalid or defective transfer" unless (a) the complaint contains the date of the alleged ineffective transfer, and (b) that transfer occurred less than sixty years prior to the commencement of the action. Public Acts, Spec. Sess., Oct., 1993, No. 93-4, § 1.

The decision of the majority does not do justice for any party. The claim of the Golden Hill Paugussett Tribe has been dismissed from court not on its merits but on the issue of representation. There is no question that the tribe's claim, properly presented, is justiciable and one for the courts ultimately to determine. *Oneida Indian Nation of New York* v. *New York*, 691 F.2d 1070, 1081 (2d Cir. 1982) ("Indian land claims have traditionally been asserted in the courts of this country for resolution"). Indeed, the tribe may choose to reinstitute this action at any time in the future, whether it be next week or 100 years from now. See *Mohegan Tribe* v. *Connecticut*, 638 F.2d 612, 614–15 (2d Cir. 1980), cert. denied, 452 U.S. 968, 101 S. Ct. 3124, 69 L. Ed. 2d 981 (1981) ("[d]efenses based upon state adverse possession laws and state statutes of limitation have been consistently rejected"); see also General Statutes § 47-61.[13] In the meantime, however, these vexing issues continue to cast a cloud on the title to the property that now stands in the name of innocent landowners and that the plaintiff Indians contend is rightfully theirs.

Unless the tribe reaches a binding settlement agreement, there are only two possible events that may serve

---

[13] General Statutes § 47-61 provides: "NO TITLE BY POSSESSION AGAINST AN INDIAN. In any action brought by an Indian or Indians for the recovery of lands owned by Indians, or sequestered for their use by the general assembly or by any town agreeably to law, the defendant shall not plead the statute of limitations, except as against an Indian or Indians authorized by law to convey Indian lands, or as against a town authorized by law to convey Indian lands."

to remove the uncertainty of the title to the real estate which is subject to the claims of the Indians. Either the Golden Hill Paugussett Tribe of Indians will cease to exist as a sovereign nation, or a court with proper jurisdiction will intercede to determine the rights of the parties. The former seems unlikely,[14] and the latter seems inevitable.

---

[14] The state has formally recognized the tribe as a sovereign nation; see General Statutes § 47-59a; and has recognized the tribe's reservation in the town of Colchester. See General Statutes § 47-63.